No. 2--06--0749

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | Appeal from the Circuit Court |
| JAMES R. MATCHEN, | ) | of McHenry County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 95--DV--233 |
| | ) | |
| JEANETTE MATCHEN, | ) | Honorable |
| | ) | Michael W. Feetterer, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE CALLUM delivered the opinion of the court:

Respondent, Jeanette Matchen, timely appeals the judgment of the circuit court of McHenry County denying her petition for leave to remove the parties' two minor children from Illinois to Wisconsin. On appeal, respondent argues that the trial court's findings are against the manifest weight of the evidence. For the following reasons, we affirm.

I. BACKGROUND

Respondent testified that she and petitioner, James Matchen, divorced in August 1995. Pursuant to the judgment of dissolution, the parties shared joint custody of their three children. At the time of the removal hearing, Jeremiah, 20 years old, lived with petitioner, and Jeffrey, 14 years old, and Jessica, 12 years old, lived with respondent. Both parties and the children reside in McHenry County.

In August 2002, respondent met and fell in love with Tom Mayer, a retired electronics engineer and professional inventor. After working in Hoffman Estates for 22 years, Mayer retired to 88 acres of land in the Wisconsin Dells area that are held in a trust for him and his brother. The land has been in his family since 1955. In 2004, respondent petitioned to remove Jeffrey and Jessica to live with her and Mayer at his home in the Wisconsin Dells. Respondent and Mayer are engaged; however, they have delayed setting a wedding date, pending the resolution of the petition for removal. The trial court held a hearing on the removal petition on August 24 and 25, 2005, September 2, 2005, and January 11, 2006.

Respondent, a house cleaner, testified that she has been self-employed for two years. She works approximately 15 hours per week. According to respondent's tax return, her total gross income for 2004 was $7,347. She testified that she earns approximately $690 per month, has approximately $1,846.49 per month in expenses, and does not have sufficient funds to pay her bills. Accordingly, Mayer pays respondent's entire rent--$750 per month--and helps her pay for gas and car repairs. Respondent testified, however, that she believes it is important to be home with her children when they are not at school--to supervise them and give them the stability and comfort of an adult presence. Respondent's work schedule permits her to be home if the children are sick, as well as when they leave for and come home from school. When the children get home from school, respondent prepares their after-school snacks, helps them with homework, organizes their belongings for the next day, and takes them to their activities. She also spends time with them playing games on the computer, biking, or going for walks. Respondent testified that it was more difficult for her to do many of those things when she was previously employed full time. Although respondent has looked in the newspaper for other job opportunities, she testified that she does not have the

qualifications for the postings and that she has not seriously looked for alternative employment in the past two years.

Respondent further testified that she currently rents a run-down, three-story home, one block from Highway 120 in McHenry. She testified that there is constant traffic in front of her house. Until recently, Jeffrey and Jessica shared an attic loft; however, to give them their own rooms, respondent now sleeps on the couch and Jessica has moved into respondent's former room. Respondent testified that her landlord is nosy and comes to the house unannounced. He peers through windows and tries the door before he knocks. The children find him "creepy." As a result, they shut the blinds, lock the doors, and stay inside because respondent does not want him in their presence. The house is musty, and the air quality poor. Respondent testified that she sought alternate housing, but could not afford it. She testified that the McHenry County Housing Department was not helpful to her in finding new housing, although she conceded that she had not used it as a resource in six years.

Mayer's Wisconsin home sits on his 88-acre property in a very quiet neighborhood. It is a three-bedroom, loft house with a full basement. The property has a pond for swimming and a shooting gallery where the children can shoot clay pigeons and engage in target practice. After some remodeling, the children would have their own bedrooms and respondent would have a bedroom as well. Since becoming involved with Mayer, respondent and the children go to Wisconsin every other weekend. When there, they spend significant time outdoors.

Respondent testified that Jeffrey is interested in hunting. In Wisconsin, he hunts, shoots, plays paintball, drives a bulldozer, rides go-carts, and fishes. She testified that he could not do many of these things near their home in McHenry, although she later conceded that her current home is

within a mile of a lake, that the children fish at that lake with petitioner, and that petitioner occasionally takes Jeffrey shooting and paintballing in McHenry County. While Jeffrey is not currently playing any sports, he used to play soccer and respondent was his soccer coach for three years. Sports are available to him in Wisconsin, should he wish to participate. Jeffrey also enjoys playing guitar, swimming, and video games. In Wisconsin, an entertainment section was built on the heated porch for video games, for television, and as a place for Jeffrey to play his guitar.

In the past, Jessica played basketball and was in the school band. She currently participates in chorus, arts and crafts, painting, and drawing. She enjoys swimming and catching frogs, and is interested in flora and fauna. According to respondent, all of those activities are available in Wisconsin. Mayer built an art gallery on the porch for Jessica to keep her crafts, paints, brushes, and easels, and she can leave her art materials set up there. Respondent stated that Jessica cannot leave her materials set up and work on arts and crafts in her current home because the only possible location, the basement, is musty, and Jessica has asthma. However, respondent conceded that Jessica has a desk set up at petitioner's home where she works on arts and crafts.

Jeffrey will be a freshman at McHenry West High School and receives A and B grades in his classes. According to respondent, the high school in the Wisconsin Dells area offers the same classes, including Spanish, that Jeffrey would take in McHenry. In addition, Wisconsin Dells High School offers German classes and higher-level history classes. The class sizes at the two high schools are approximately the same. Jessica will be in the seventh grade and performs well academically. The middle school in the Wisconsin Dells has a slightly smaller class size than her school in McHenry. Certain extracurricular activities in McHenry may be cut for budgetary reasons. Respondent testified that the art classes at Jessica's school might be cut if a referendum fails. In

contrast, art classes would remain available to her in Wisconsin. While it costs $200 to enroll Jeffrey in the high school in McHenry, it would cost $20 to enroll him in the Wisconsin Dells school. Similarly, while it would cost $115 to enroll Jessica in the McHenry middle school, it would cost $20 to enroll her in the Wisconsin Dells school. Petitioner, however, pays half of the school registration fees for both children. Respondent testified that Jeffrey spends time with two friends in McHenry, but that he has an outgoing personality, is likeable, and would have no trouble making friends in Wisconsin. Respondent testified that Jessica spends time with primarily one friend in McHenry, but that she is "a very friendly bubbly little girl. She is always cheerful. She makes friends everywhere she goes."

Jeffrey and Jessica have extended family in both locations. Respondent's brother lives in Oxford, Wisconsin, approximately 10 minutes away from Mayer's home. He is married with two children--a son and a daughter, ages 22 and 18 respectively. Jeffrey goes paintballing with his cousin and uncle. Respondent's parents also live in Oxford. Respondent testified that, prior to her relationship with Mayer, she and the children saw her parents and brother once a year, but now they see them more regularly. She testified that the children spend the night at their grandparents' house if they are in Wisconsin for longer than a weekend and that they try to see respondent's family as much as possible while there.

In McHenry, Jeffrey and Jessica have a good relationship with Jeremiah. Respondent testified that she was not concerned that a move would affect their relationship with Jeremiah. Two of respondent's sisters and their children live approximately 5 to 10 minutes away from respondent's home in McHenry. Jeffrey and Jessica maintain relationships with their aunts and cousins and see them at least twice per month and sometimes twice per week. Respondent's third sister and her

children live approximately 15 to 20 minutes away from them in McHenry County, and Jessica and Jeffrey see them once every other month. Petitioner also has family in the McHenry area, including a brother and his two children, and a sister and her daughter in Marengo. Both parties agree that Jessica and Jeffrey are close to all of their family members in the McHenry area. According to respondent, it is important that the children continue to maintain those relationships if they move to Wisconsin.

Respondent testified that Mayer makes her happy and more relaxed and that her relationship with Jeffrey and Jessica has thereby been enhanced. Respondent testified that, although the children initially were not happy about her relationship with Mayer, their relationship with him is much improved and they get along well with him. Respondent testified that she does not see how her relationship with Mayer could continue if she does not move to the Wisconsin Dells. She testified that she has not discussed with Mayer whether he would terminate his financial support in the event the petition were denied. If that were to happen, however, she would need to obtain full-time employment to meet her living expenses. If she moved to Wisconsin, she would not work because Mayer would provide for her and the children. She would not have to worry about leaving the children home alone or getting a full-time job and babysitters. She testified that the move would make her happier and more stable, which would enhance the children's quality of life. She believes that the children would also benefit from the move in that they would be able to more easily participate in activities they enjoy, be close to their grandparents, and have more quality time with respondent because she would be available to them at all times. Finally, respondent testified it would be better for the children to have a stable home to live in, instead of constantly traveling back and forth between Wisconsin and Illinois. For example, she explained that sometimes the children

are tired and do not want to get in the car for the trip home from Wisconsin. Nevertheless, regardless of the outcome of her removal petition, respondent testified that she intends to continue traveling to Wisconsin with the children every other weekend.

Mayer described his relationship with Jeffrey as "exceptional" and testified that he gets along "very very well" with Jessica. His relationship with respondent is "exceptionally good," and he explained that there is a noticeable difference between her mood in McHenry and her mood in Wisconsin, where she just relaxes and opens up. He testified that, in his opinion, moving to Wisconsin would absolutely benefit respondent and the children, in terms of finances, schools, and the pristine, peaceful setting, and because the children would be approximately seven minutes away from their only surviving grandparents. Mayer agreed that it would be difficult for him and respondent to maintain a successful marriage if they could not live under the same roof. When asked whether he would consider moving back to Illinois, he testified:

"A: Well I would have to say where I live now it's been a 30 year dream and I have been working on this very very hard for the second half of my life to develop what I have. It would be an extremely difficult decision. It would be hard. I suppose if I had to -- I can't sell the property because it's in a trust. It can't be divided or sold so certainly I would like to reside somewhere in a rural area. I pretty much had my fill of the city.

Q: Would there be any place in Illinois that you would consider living?

A: More likely it would be back in the farmlands again south. I enjoy the south."

Mayer testified that, if the petition for removal were denied, he did not intend to break off the engagement or cut off his relationship with the children; his primary goal was to ensure that the children remain happy regardless of the outcome of the removal proceedings. However, he testified

that the financial assistance he provides to respondent would be difficult to maintain if the petition were denied.

Currently, petitioner visits with Jeffrey and Jessica every other weekend from 3 p.m. on Friday to 6 p.m. on Sunday, and every Tuesday or Thursday evening from 3 to 7 p.m. Respondent testified that petitioner exercises his every-other-weekend visitation "religiously." Petitioner testified that the parties have been able to manage visitation issues smoothly and with flexibility; however, there have been relatively minor issues that have arisen since the frequent trips to Wisconsin began. Petitioner regularly exercises four weeks of visitation with the children in the summer, in two-week intervals; however, he often works during those weeks. Pursuant to the dissolution judgment, petitioner also may visit with the children on alternate Christmas holidays and alternate spring breaks. Respondent testified that petitioner exercises four days of his Christmas visitation, but that he does not exercise his spring break visitation. Petitioner testified that he does not exercise the spring break visitation because he has to work and the children prefer to spend their spring breaks in Wisconsin. Occasionally, petitioner stops by respondent's home for extra visits and Jeffrey has ridden his bike to petitioner's house.

Petitioner testified that, when he is with the children, they typically run errands, such as grocery shopping, followed by board games or cards, trips to the movies, or camping. Petitioner cooks them breakfast and cooks them a big dinner on Sunday evening before he takes them home. He testified that Jeffrey loves to play paintball, shoot, and hang out with friends. Jessica enjoys coloring, puzzles, spending time with him, fishing, and riding her bike. Jessica also engages in arts and crafts when spending time with him. He testified that the children participate in numerous outdoor activities with him, including fishing, swimming at the community pool, paintball, and

shooting. When it snows, petitioner takes them to hills, where they go sledding. Most of these activities take place in the McHenry area.

Respondent testified that petitioner came to watch most, but not all, of Jeffrey's soccer games. She testified that his attendance increased after she wanted to move to Wisconsin. She testified that he did not attend open houses at the children's schools, attended only one parent-teacher conference in the past five years, and does not ask respondent for the children's report cards or school schedules. Respondent later acknowledged that she advised petitioner that it was unnecessary for him to attend the parent-teacher conferences because the children were doing well in school and that he sees their report cards because the children give him copies. Respondent testified that petitioner has attended all of Jessica's band recitals and choral concerts. She described Jeffrey and petitioner as "buds" and Jessica as "daddy's girl."

If her petition for removal is granted, respondent proposes that the visitation schedule be altered to allow petitioner a full week of visitation at spring break, every other year, and possibly another week of visitation in the summer. In order to make up for the one weekday that he would lose, she suggested that he could speak with Jeffrey and Jessica by phone during the week and then, if a three-day weekend fell on a weekend he was to have the children, he could have the extra day with them. In addition, instead of the usual 6 p.m. Sunday drop-off time, he could drop them off at 7 p.m. The trip to the Wisconsin Dells from McHenry is approximately three hours long, so she proposed that they each drive half way for the drop-offs and pick-ups. She believed that the extended driving time would have a positive effect on the children's relationship with petitioner because they would have his full attention in the car and they would be able to communicate for that hour and 30 minutes each way.

Petitioner, however, testified that the three hours spent driving to and from Wisconsin on alternating weekends constitutes time he will be paying attention to traffic and driving, not time spent with the children. While the time in the car might be peaceful, he disagrees with respondent that it constitutes quality time with the children. He does not think that the children will enjoy the six hours in the car every other weekend--three hours to Wisconsin and three hours back in a 48-hour period--and he does not think that it is in their best interests. He testified that the children have gone to McHenry schools their entire lives and that they both have friends there. He is concerned that the McHenry schools are cutting back on their after-school programs but is otherwise pleased with the education that the schools have provided. Moreover, the cutbacks would not affect the children, as they are not enrolled in any of the activities that would be eliminated.

Petitioner is familiar with respondent's McHenry home and testified that, while the home is close to Highway 120, the children are never outside by the road. He testified that the home has three bedrooms but one bedroom is being used as an office. Moreover, he testified that Jessica's asthma is under control as long as she takes her medication. Petitioner testified that he objects to the removal because he does not feel that he will be able to see the children as often. As he explained, with the elimination of the weekday visitation, he will see them 52 fewer days per year. He feels that, as Jeffrey and Jessica get older, they will start developing their own lives and become busy and will not want to make the trip back to Illinois every other weekend. Thus, it will become harder for him to be a part of their lives. Petitioner testified, "I just want the kids to be happy. That's my only purpose I guess." He does not believe that the children would be as happy if the removal petition were granted. Both children testified in camera that they did not wish to move to Wisconsin.

On June 29, 2006, the trial court denied respondent's petition for removal. The court noted that it applied and balanced all relevant factors including, but not limited to, the factors in In re Marriage of Eckert, 119 Ill. 2d 316 (1988), and found that removal was not in the children's best interests. Specifically, the court found that it was unclear that a move to Wisconsin would likely enhance the quality of life for respondent or the children and found that the children have strong ties to family, friends, and the McHenry community. The court found that, "while [respondent's] proposed visitation schedule appears reasonable at first blush, the court will not make Jeffrey and Jessica change schools, leave their friends and much of their family, sit in a car for six hours every other weekend in order to see their father, and eliminate their time with their father during the week, simply because Mr. Mayer chooses not to move if he can avoid it." The court found that the negative aspects of the children's current living situation in McHenry exist, in large part, due to respondent's decision to work only 15 hours per week. Although the court acknowledged that marriage would provide respondent with improved financial security, it determined that respondent and Mayer were not unable to make a life together in Illinois but that Mayer "does not want to live in Illinois, if he can avoid it." The court found there was no evidence to suggest that respondent's motives in seeking removal were to frustrate petitioner's visitation, or that petitioner's objection to the removal was motivated by anything other than genuine concern for his relationship with the children. Respondent appeals.

## II. STANDARD OF REVIEW

Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609(a) (West 2004), which governs removal petitions, provides:

"The court may grant leave *** to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking removal." 750 ILCS 5/609(a) (West 2004).

Thus, the paramount question in a removal case is whether the move is in the children's best interests. Eckert, 119 Ill. 2d at 325. This determination must be made on a case-by-case basis, with consideration given to the circumstances of each case. Eckert, 119 Ill. 2d at 326. Nevertheless, there are certain, nonexclusive factors a trial court should consider in determining whether removal is in the children's best interests. In re Marriage of Collingbourne, 204 Ill. 2d 498, 522 (2003). These include: (1) whether the proposed move is likely to enhance the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent, as to whether the removal is merely a ruse intended to defeat or frustrate visitation; (3) the motives of the noncustodial parent in resisting removal; (4) the effect on the noncustodial parent's visitation rights; and (5) whether a realistic and reasonable visitation schedule can be reached if the move is permitted. Collingbourne, 204 Ill. 2d at 522-23; Eckert, 119 Ill. 2d at 326-27. None of these factors is controlling and the weight to be accorded each factor will vary depending on the facts of the case. Collingbourne, 204 Ill. 2d at 523; In re Marriage of Johnson, 352 Ill. App. 3d 605, 613 (2004).

A trial court's determination of what is in the children's best interests will not be reversed unless that determination is against the manifest weight of the evidence and it appears that a manifest injustice has occurred. Collingbourne, 204 Ill. 2d at 521-22. A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings

are unreasonable, arbitrary, and not based on any of the evidence. In re Marriage of Main, 361 Ill. App. 3d 983, 989 (2005). The trial court is in the best position to assess and evaluate the parties' temperaments, personalities, and capabilities, and the presumption in favor of the result reached by the trial court is always strong and compelling in a removal case. Collingbourne, 204 Ill. 2d at 522. When applying the manifest-weight standard, we are mindful that "[a] reviewing court may not overturn a judgment merely because the reviewing court might disagree with the judgment, or, had the reviewing court been the trier of fact, might have come to a different conclusion." People v. A Parcel of Property Commonly Known As 1945 North 31st Street, Decatur, Macon County, Illinois, 217 Ill. 2d 481, 510 (2005).

### III. ANALYSIS

Respondent challenges the trial court's findings on the first, fourth, and fifth Eckert factors, as well as its ultimate conclusion that removal is not in the children's best interests. First, respondent argues that the trial court erred in concluding that it was unclear that the move to Wisconsin would likely enhance the quality of life for respondent, Jeffrey, and Jessica. Respondent contends that the evidence established that the move would enhance all of their lives with respect to finances, housing, recreation, family relationships, school programs, and stability.

Respondent likens this case to In re Marriage of Eaton, 269 Ill. App. 3d 507 (1995). In Eaton, the trial court denied a mother's petition for removal. The court found that moving the parties' children from Illinois to Florida would offer improved recreational and cultural activities for the children and an improved financial and social situation for the mother. Nevertheless, in denying the petition, the court found that the move would drastically reduce the amount of contact the children had with their grandparents, uncles, and cousins in Illinois and would impair their father's

involvement with the children, and that the father's involvement was not preserved by the mother's proposed visitation schedule, which provided the same amount of time with the children but in long blocks, rather than frequent, year-round contacts. The court concluded that it was not convinced that the move would improve the quality of life for the children.

On appeal, the court reversed and noted that, for years, the mother had suffered the social, financial, and scheduling pressures of a single parent. She was forced to borrow money from her parents to meet her financial obligations. By remarrying, she would receive child rearing help as well as love, economic security, and a comfortable home in a desirable locale. The court found that the trial court failed to sufficiently consider the benefits that children derive from the financial and emotional well-being of their custodial parent. Eaton, 269 Ill. App. 3d at 515. Moreover, the court held that, in denying the petition because the children's contact with their extended family and father in Illinois would be impaired, the trial court did not acknowledge that the custodial parent's duty to foster relationships with the noncustodial parent or extended family does not require the custodial parent to give up the right to pursue a new life. Eaton, 269 Ill. App. 3d at 513-14.

Respondent argues that, like the mother in Eaton, she has established that both her financial and living situations would be greatly improved if the removal petition were granted and that the trial court failed to consider the benefits Jeffrey and Jessica would derive from her enhanced circumstances. Further, she contends that the trial court's consideration of the separation that would occur between the children and their family in Illinois effectively penalizes her for actively fostering and encouraging relationships between the children and their father, friends, and family. Thus, she concludes that the trial court's finding that it was unclear that Jeffrey's and Jessica's lives would likely be enhanced by the move was against the manifest weight of the evidence.

-14-

We disagree. It is important to emphasize that the court in Eaton considered the mother's improved financial situation as but one part of its overall balancing analysis. Similarly, the courts in Main, 361 Ill. App. 3d at 990, and In re Marriage of Ludwinski, 312 Ill. App. 3d 495, 500-01 (2000), also cited by respondent, considered the custodial parents' improved financial and living situations in their overall analyses as factors weighing in favor of removal. However, in all three of these cases, there were other critical factors that weighed in favor of removal. For example, in Eaton, the mother's fiancé was unable to move to Illinois, and the cultural, educational, and recreational opportunities in Florida were clearly superior. In Main, the noncustodial father did not exercise his visitation rights and, although he did not want the children to move to Switzerland, he refused to let them live in his home. In Ludwinski, the noncustodial parent's motives in opposing the removal were questioned.

"[R]arely will the facts and circumstances in two separate removal cases be comparable. Reviewing courts and trial courts alike should take care to review the particular facts of each removal case, as one case is likely distinguishable from the next." Johnson, 352 Ill. App. 3d at 616. In other words, the best-interests determination in a removal case is extremely case specific and requires consideration and balancing of all factors, with the weight of each factor varying depending on the case. Here, the trial court did note that the move would enhance respondent's financial situation, a fact that would undoubtedly benefit the children. However, the court determined that the children would still lose more than they would gain if they moved and, thus, that the first Eckert factor weighed against removal. Our task on review is to examine whether there is a basis in the record for the trial court's decision. We conclude that there is.

First, the record demonstrates that the move to Wisconsin would not provide any meaningful enhancement in circumstances for the children in terms of schools. The evidence shows that the schools are relatively equivalent in terms of curriculum and class size. Although there was a possibility of some curriculum changes in McHenry, the changes were tied to an upcoming referendum vote and, thus, were speculative. Second, as to recreational activities, such as swimming, shooting, paintballing, and arts and crafts, the evidence showed that most activities available in Wisconsin are also available in Illinois. The fact that they may be slightly more accessible--right outside the door instead of a short drive away--would not significantly or materially improve the children's lives. Finally, as to housing, while the Wisconsin home and location appear attractive, the fact remains that the children will have their own rooms, whether in Wisconsin or in McHenry. It is respondent who will no longer be sleeping on the couch, although we note that petitioner's testimony that the McHenry home is a three-bedroom house with one bedroom used as an office was unrebutted. While it is true that the Wisconsin home has a separate room for Jessica's arts and crafts, which would be available to her throughout the week, we note that there is also room set aside for Jessica's arts and crafts at petitioner's home. Jeffrey can use the Wisconsin room for playing guitar and video games, but there was no testimony to suggest that he was unable to do those things in his McHenry home. Although the Wisconsin home may not be musty, the record shows that Jessica's asthma is controlled if she takes her medication. Thus, in regard to housing, the children would essentially not gain anything new.

The trial court found, and respondent contends, that her financial situation will improve with the move. This is uncontested, and we do not dispute this conclusion. We do note, though, that respondent paints the picture as though it is a certainty that she will have to work full time if the

petition is denied and, thus, that the children will suffer. However, respondent testified that she had not discussed with Mayer whether he would continue to assist her financially if she did not move to Wisconsin. Further, although Mayer testified that it would be difficult, he did not say that he would discontinue his financial assistance. Indeed, he testified that he did not intend to break off their relationship and that his goal was to ensure the children's happiness regardless of the outcome of the removal petition. In any event, assuming the move would benefit respondent financially, allowing her to be more relaxed and available to the children on a full-time basis, the question becomes whether those benefits outweigh the things the children would give up if they move.

The trial court found, and the record supports, that the children have strong ties to their family in McHenry County. Although Jessica and Jeffrey have family in Wisconsin, their father, brother, aunts, uncles, and cousins all live in McHenry County. Both parties testified that Jeffrey and Jessica have close relationships and frequent contact with those family members. The court explicitly found that the children have thrived because of those ties, and the record reflects that the children are reluctant to leave these family members. Contrary to respondent's assertion, the trial court's consideration of the move's effect on the children's relationships with their father and relatives in Illinois was certainly appropriate. While respondent's encouragement of these relationships was not a waiver of her right to pursue a new life or pursue removal, certainly the move's effect on the children's relationships with family and friends is one factor, among many, to be evaluated and weighed in determining their best interests. See Johnson, 352 Ill. App. 3d at 613. We do not think the trial court erred in giving this factor great weight in its analysis.

Respondent contends that she will be able to actively encourage maintenance of these relationships after moving and that she will be able to bring the children back and forth to Illinois.

We find respondent's testimony a bit contradictory. On the one hand, respondent explains that the children will benefit from the move because they will be stable and not forced to travel back and forth between Wisconsin and Illinois all the time, a trip that they are sometimes understandably reluctant to make. At the same time, she asserts that she will bring them back and forth to see their Illinois family, that their relationship with petitioner will not suffer because they will be returning to Illinois every other weekend, and that she will continue to drive them back and forth to Wisconsin every other weekend even if the petition is denied. Thus, although she touts stability for the children as a major factor in favor of removal, it appears that she is the only person who will truly be in a more stable environment after the move.

Perhaps most importantly, the trial court apparently found that the detriment to the children's relationship with their father, as well as those with their other relatives, outweighed any marginal benefits the move may provide in other areas. The court specifically noted that petitioner has an extremely close relationship with both children, that Jeffrey and petitioner are "buds" and Jessica is "daddy's girl." In other cases, an extremely close relationship between the children and their noncustodial parent has been an important factor weighing against removal. See, e.g., In re Marriage of Smith, 172 Ill. 2d 312, 324 (1996). In particular, and with respect to the fourth and fifth Eckert factors, the trial court here found that the move to Wisconsin would impede petitioner's visitation with his children and that the proposed revised visitation schedule was inadequate. It noted that the children would be forced to travel six hours every other weekend to visit their father and that their weekday visits with their father would be eliminated. Although removal will always have some impact on visitation, the question is whether a reasonable visitation schedule can be created. Collingbourne, 204 Ill. 2d at 532.

Here, the court found that respondent's proposed schedule was reasonable only "at first blush." This conclusion is supported by the record. For example, making up for the loss of weekday visitation by offering petitioner time with the children on three-day weekends initially appears reasonable. But, upon closer examination, it appears respondent offers those weekends only if they happen to fall on petitioner's already-scheduled weekends. This would do essentially nothing to offset the 52 lost weekdays per year. Also at first blush, offering petitioner alternating spring breaks appears reasonable, but, upon closer examination, it is clear that he is already entitled to alternating spring breaks pursuant to the dissolution judgment. The court noted, and the record supports, that petitioner currently stops by on occasion to say hello to the children and that Jeffrey has ridden his bike to petitioner's house. The record reflects that petitioner exercises most of his visitation rights "religiously," has attended the children's choral concerts and soccer games, and spends quality time with the children when they are together. This type of accessibility to the children would be drastically reduced, if not eliminated, if the petition were granted.

The trial court noted that, when a parent regularly exercises his visitation, " 'a court should be loath to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons.' " Eckert, 119 Ill. 2d at 327, quoting D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 205-07, 365 A.2d 27, 30 (1976). Respondent takes issue with the trial court's findings that Mayer's refusal to move to Illinois was an unpersuasive and inadequate reason for removal and the court's apparent finding that respondent was responsible for the family's financial situation in McHenry. While respondent is correct that neither the Act nor Eckert requires that she or Mayer exhaust employment or housing opportunities in Illinois for removal to be granted (see Ludwinski, 312 Ill. App. 3d at 500-01), the court should consider all circumstances of the case in considering

the best interests of the children. See Collingbourne, 204 Ill. 2d at 522-23, Eckert, 119 Ill. 2d at 326. Indeed, the ability of the removal-petitioner or his or her spouse or partner to relocate is often considered in removal cases, even if it is not dispositive of the ultimate issue. In Eaton, the court recalled that the mother's fiancé had an established law practice in Florida and that it was unfeasible for him to move to Illinois. Eaton, 269 Ill. App. 3d at 509. In Johnson, the court noted that the mother's husband was required to take a transfer to Arizona or accept a severance package and that he had sent resumes to two other companies. Johnson, 352 Ill. App. 3d at 607. In In re Marriage of Repond, 349 Ill. App. 3d 910, 912, 917 (2004), we noted the fact that the mother, a physicist, had lost her job and could not find a new one in the United States but was able to obtain employment in Switzerland. In addition, the mother's husband, a former professor at the University of Illinois, had unsuccessfully tried to extend his employment with the university and, thus, resided and taught in Switzerland. Repond, 349 Ill. App. 3d at 912.

Here, Mayer understandably wishes to remain on his property in Wisconsin, but the court did not err in considering this fact or considering that there was nothing to prevent Mayer from coming to Illinois. Indeed, the trial court should hear any and all relevant evidence. Eckert, 119 Ill. 2d at 326. As to the court's comments regarding respondent's choices and their effect on her current financial and housing conditions, we do not read the court as having improperly penalized respondent for not seeking increased earning opportunities or improved housing. Rather, the court simply recognized that her current undesirable conditions were linked to her decision to provide other benefits to her children.

Finally, we note that the children testified in camera that they did not wish to move to Wisconsin. While the children's preference in a removal case is not determinative (see, e.g.,

Collingbourne, 204 Ill. 2d at 534), the trial court here gave due consideration to their wishes in its best interests analysis.

In sum, we cannot conclude that the trial court's denial of the petition for removal was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

BYRNE, J., concurs.

JUSTICE BOWMAN, dissenting:

I respectfully dissent. In my opinion, the trial court's denial of respondent's request to remove the children from Illinois to Wisconsin was against the manifest weight of the evidence. Thus, the judgment should be reversed.

Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609(a) (West 2004)) allows a trial court to approve a custodial parent's removal of the minor children from Illinois when it is in the children's best interests. In denying respondent's removal request, the trial court stated that it "applied and balanced" the various factors set forth by our supreme court in In re Marriage of Eckert, 119 Ill. 2d 316 (1988). The Eckert factors include: (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the children; (2) whether the proposed move is a ruse designed to frustrate or defeat the noncustodial parent's visitation; (3) the noncustodial parent's motives in resisting removal; (4) the noncustodial parent's visitation rights; and (5) whether a reasonable visitation schedule can be worked out. Eckert, 119 Ill. 2d at 326-27. According to the trial court, it was unclear that a move to Wisconsin would likely enhance the quality of life for respondent and the children. In addition,

the court found that the fourth and fifth Eckert factors pertaining to visitation did not favor removal.

A trial court's determination of what is in the children's best interests will not be reversed on appeal unless that determination is against the manifest weight of the evidence and it appears that a manifest injustice has occurred. In re Marriage of Parr, 345 Ill. App. 3d 371, 376 (2003). While the majority and I agree that the manifest-weight standard applies, the majority concludes that the trial court's decision cannot be reversed under this standard. I disagree. A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary, and not based upon any of the evidence. In re Marriage of Main, 361 Ill. App. 3d 983, 989 (2005). Based on my review of the record, the trial court's decision is against the manifest weight of the evidence because the opposite conclusion is clearly evident and a manifest injustice will result from preventing the children's removal. Thus, unlike the majority, I believe that application of the manifest-weight standard requires reversal in this case. See In re Marriage of Ludwinski, 312 Ill. App. 3d 495, 498 (2000) ("Although the trial court has broad discretion in these cases, that discretion is not unlimited and, when the decision is against the manifest weight of the evidence, it will be reversed"). Otherwise, the manifest-weight standard becomes tantamount to no review at all.

In In re Marriage of Collingbourne, 204 Ill. 2d 498, 523 (2003), our supreme court cautioned that the purpose of the factors set forth in Eckert is not to establish a test in which the parent seeking removal must meet every prong; rather, the Eckert factors are to be considered and balanced by the trial court and no one factor is controlling. Further, while the Eckert factors should be considered, they are not exclusive and a trial court may validly consider other relevant factors, as dictated by the specific circumstances in the case. Collingbourne, 204 Ill. 2d at 522-23. For the following reasons,

I disagree with the trial court's assessment of the Eckert factors in this case. In addition, I believe that there are other relevant factors that favor the children's move to Wisconsin.

With respect to the first Eckert factor, the trial court found that, while the Wisconsin Dells is a beautiful place to visit, the children have "strong ties with family, friends and community in McHenry, Illinois." The court further found the following:

"The negative aspects of their current living situation in McHenry exist, in large part, because of the choices that [respondent] has made. [Respondent] chooses to work only 15 hours a week. While this choice has allowed [respondent] to spend more time with her children before and after school, it requires her family to live in a house that she does not like. This choice has also and [sic] prevented [respondent] from making ends meet without the financial assistance of her fiancé."

Contrary to the majority's conclusion, I believe that the trial court improperly penalized respondent for not seeking increased income opportunities or improved housing. See Ludwinski, 312 Ill. App. 3d at 500 (the trial court may have inappropriately penalized the custodial parent for not seeking increased income opportunities in Illinois). Whether the parent requesting removal seeks employment in Illinois is not one of the Eckert factors that courts must consider. Ludwinski, 312 Ill. App. 3d at 500-01. Moreover, the custodial parent seeking removal is not required to make every effort to remain in Illinois or to exhaust all employment opportunities in Illinois. Ludwinski, 312 Ill. App. 3d at 500. Respondent explained that she works approximately 15 hours a week because she feels that it is important to be home with Jessica and Jeffrey when they are not in school. Respondent's schedule permits her to be at home before and after school, when the children stay home sick, and in the summer. Respondent testified that based on her salary, she could not afford

a better place to live. Respondent is able to work fewer hours and spend time with her children due to Mayer's financial assistance. However, Mayer testified that if respondent remains in Illinois, it will be difficult to continue to support her on an ongoing basis. Thus, unless Mayer moves to Illinois, respondent will be forced to find a full-time job to support her family. Obviously, working full time means less time with her children. Also, respondent testified that she is not qualified for most jobs because she does not have special training beyond a high school education. Accordingly, the stress of finding full-time work is compounded by her level of schooling, which limits her employment options.

In addition to financial pressures, a single parent must face a myriad of scheduling pressures. Collingbourne, 204 Ill. 2d at 527. As the children's primary caretaker, it is respondent's responsibility not only to pay expenses but to handle conflicts between her work schedule and the children's care. See Collingbourne, 204 Ill. 2d at 526-27 (the day-to-day issues a single parent must face include the children's physical and emotional well-being, their performance at school, their desire to engage in extracurricular activities, and their care when the parent cannot be with them). Respondent explained that her previous full-time job required her to work from 7:30 a.m. to 5 p.m. and that she could not pick up the children after school. Because full-time employment allows only so much flexibility in taking time off, respondent expressed concern that she would not be able to be home when the children are sick and that the children will be unsupervised during the summer.

Conversely, if respondent moved to Wisconsin, she would not need to work because Mayer would provide for her and her children. See Collingbourne, 204 Ill. 2d at 529 (an improvement in the financial situation of the custodial parent will generally benefit a child by enhancing the child's

standard of living). Not only would she be relieved of the stress of finding a job and working full time, but she would have more quality time with Jeffrey and Jessica. Respondent would not need to worry about rushing off to work, hiring babysitters, or leaving the children home alone. In her words, respondent is trying to establish a suitable, comfortable family life where she is not "on edge." She testified that Mayer makes her happy, that she is more relaxed in Wisconsin, and that her relationship with Jeffrey and Jessica has thereby been enhanced. See Collingbourne, 204 Ill. 2d at 526 (the best interests of the children cannot easily be severed from the interests of the custodial parent with whom the children reside and upon whose mental and physical well-being the children primarily depend).

Furthermore, the creation of a new family unit and the social environment of a traditional family setting may be considered an important benefit to children. Collingbourne, 204 Ill. 2d at 529. Indeed, our society places great weight on the right to marry and remarry. Eaton, 269 Ill. App. 3d at 516. It was respondent's belief that the children would benefit from a "complete family," meaning a man and a woman in the home. This way, the children would have both female and male perspectives on everyday issues. "[S]ince a court has no power to require the noncustodial parent to remain in Illinois, or to require members of the extended family to remain in Illinois, some deference is due to the custodial parent who has already determined the best interests of her children and herself are served by remarriage and removal." (Emphasis in original). In re Marriage of Eaton, 269 Ill. App. 3d at 515-16.

In addition, the children's living conditions would be enhanced by moving to Wisconsin. First, there is stability in living in Mayer's home without the worry of rent or a nosy landlord. According to respondent, she moved several times before renting her current home, and her current

home is problematic due to its location near a busy highway and the landlord situation. If removal were permitted, she would not have to find more suitable housing in Illinois. Second, Jessica has asthma and respondent testified that the rental property is musty and that the air quality is poor. In the Wisconsin home, Mayer installed a high-efficiency air filter in the furnace, which he testified remedied some of Jessica's problems. Third, Mayer was constructing a room specifically devoted to the children that would contain shelves, tables, and benches. According to Mayer, the entertainment section/art gallery would provide a place for Jessica's crafts and Jeffrey's interests. For these reasons, I disagree with the majority's conclusion that, with respect to housing, the children would essentially not gain anything new. I also note that the Wisconsin property provides greater access to the activities the children enjoy, in that it contains a pond, a shooting gallery, and 88 acres of wildlife and nature.

With respect to the trial court's finding that the children have strong ties with their extended family in Illinois, this factor does not outweigh the value of the relationships they have developed with respondent's extended family in Wisconsin. Respondent explained that in the past, she was not able to visit her parents or her brother's family in Wisconsin very often because she worked full-time during the week and cleaned houses on the weekends. However, in traveling to Wisconsin the past few years, both Jeffrey and Jessica have become close to their grandparents and their uncle's family. Respondent testified that Jeffrey was now "very close" to her brother and that they often hunt and go paintballing together. Also, both respondent and petitioner testified that Jeffrey and Jessica do not see their grandparents as often as they would like.

Moreover, there is no reason why the children cannot maintain relationships with their extended family in McHenry County if they move to Wisconsin. Petitioner testified that the children

see his extended family approximately twice a month, which could continue during the children's alternate weekend visits in McHenry County. Respondent also recognized the importance of maintaining relationships with her family members in the McHenry area. She testified that she was willing to bring her nieces and nephews to Wisconsin or bring her children to Illinois to continue those relationships. According to respondent, one of her sisters travels to Wisconsin "quite often" so that her son can hunt, which would provide opportunities for Jessica and Jeffrey to spend time with them. Given her history of maintaining these relationships, there is nothing to suggest that they would be lost if respondent and her children were allowed to move three hours away.

The next two Eckert factors relevant here involve the visitation rights of the noncustodial parent and whether a realistic and reasonable visitation schedule can be reached if the move is allowed. With respect to these factors, the trial court found the following:

"In the present case, the court finds Mr. Mayer's unwillingness to move to Illinois 'if I can avoid it' to be both an unpersuasive and inadequate reason for removal. Thus, while [respondent's] proposed visitation schedule appears reasonable at first blush, the court will not make Jeffrey and Jessica change schools, leave their friends and much of their family, sit in a car for six hours every other weekend in order to see their father, and eliminate their time with their father during the week, simply because Mr. Mayer chooses not to move if he can avoid it."

I disagree with the trial court's assessment of the evidence regarding visitation. Respondent is the same mother who cooperated in visitation and fostered the children's relationships with petitioner and their extended family in McHenry County. While the trial court noted that petitioner would lose one evening's visitation during the week, the visitation schedule upon removal need not

be equivalent to that prior to removal. Ludwinski, 312 Ill. App. 3d at 502. Because any removal will have some effect on visitation, the real question is whether a visitation schedule that is both reasonable and realistic can be created. Eaton, 269 Ill. App. 3d at 515. A reasonable visitation schedule is one that will preserve and foster the children's relationship with the noncustodial parent. Eckert, 119 Ill. 2d at 327. It need not be perfect. Parr, 345 Ill. App. 3d at 379. Initially, I note that the judgment of dissolution did not provide for weekday visitation with petitioner. However, when respondent was employed full time, she had to work one weekday evening, and the children stayed with petitioner. Although respondent no longer works full time, she has continued that visitation schedule, which is evidence of her commitment to the children's relationship with their father. See Eaton, 269 Ill. App. 3d at 515 ("Instead of assuming visitation could not be reasonably accommodated if permission for removal were granted, the presumption ought to be in [the mother's] favor, i.e., [she] will continue to cooperate in a reasonable and realistic schedule designed to preserve [the father's] relationship with his children").

Moreover, respondent's request to move to Wisconsin involves only a three-hour drive from McHenry County. As a result, it is not the type of long-distance move that requires complicated travel plans or that will substantially impair petitioner's involvement with the children. See Eckert, 119 Ill. 2d at 328 (when removal to a distant jurisdiction will substantially impair the noncustodial parent's involvement with the child, the trial court should assess the potential harm to the child that may result from the move). Because petitioner will be able to continue his every-other-weekend visitation schedule with the children as before, the distance between them will not greatly limit the frequency of their contact or adversely affect the quality of their relationship. See Collingbourne, 204 Ill. 2d at 533 (where former bimonthly visitation would be replaced with a schedule that allows

less frequent, but more extended, contact between the father and the son, the trial court must evaluate both quantitative and qualitative differences in visitation). While there would be an effect on visitation, the three-hour distance would not prevent petitioner from maintaining a close relationship with Jessica and Jeffrey.

The majority points out that petitioner currently stops by on occasion to say hello to the children, that he has attended the children's choral concerts and soccer games, and that Jeffrey has ridden his bike to petitioner's house. According to the majority, this type of accessibility to the children would be drastically reduced, if not eliminated, if the petition were granted. However, as stated, removal will always have some impact on visitation. Otherwise, children could never be removed if the custodial parent lives close to the noncustodial parent and the children share a close relationship to the noncustodial parent. Also, I believe that the majority overstates petitioner's day-to-day contact with the children. It appears that Jeffrey has ridden his bike to petitioner's home on five occasions and that he is no longer participating in soccer. According to respondent, petitioner's unscheduled visits were infrequent and did not last more than five minutes. See In re Marriage of Stahl, 348 Ill. App. 3d 602, 619 (2004) (Bowman, J., dissenting) (the noncustodial parent's fears regarding visitation are not well founded given the relatively short distance to Wisconsin the custodial parent wants to move). In any event, the crucial question is whether a reasonable visitation schedule can be created.

In my opinion, such a schedule can be achieved in this case without harming the children. To this end, respondent proposed a schedule in which she would meet petitioner half way for the drop-offs and pick-ups, and give him extra time on Sundays. To make up for the one weekday that petitioner would lose, respondent suggested that he could talk to Jessica and Jeffrey on the phone

during the week, and then if a three-day weekend fell on his scheduled weekend, he could have the extra day with them. She also proposed giving petitioner a full week of visitation at spring break, every other year, and possibly another week of visitation in the summer.

Given their amicable history, I have no doubt that the parties could create a schedule that preserves petitioner's relationship with the children. Both respondent and petitioner testified that visitation has proceeded smoothly in the past and that they have worked together in being flexible and fashioning a workable schedule. There is no reason why the parties' mutual love for the children would not ensure such cooperation in the future. Admittedly, where a noncustodial parent has been diligent in exercising visitation rights, the court should be reluctant to permit removal of children for frivolous or inadequate reasons. Ludwinski, 312 Ill. App. 3d at 503. However, as discussed, respondent's reasons are neither frivolous nor inadequate. Moving to Wisconsin will provide benefits of financial security, increased time with her children, improved living conditions, stable housing, and a traditional family setting.

It is well established that a noncustodial parent does not possess a veto power to stop a custodial parent from exercising a reasonable desire to remarry and move out of the state. Ludwinski, 312 Ill. App. 3d at 504. By denying respondent's removal petition, the trial court is essentially requiring that respondent choose between a new husband in Wisconsin and working full-time in Illinois to remain with her children. Cf. Eaton, 269 Ill. App. 3d at 516 ("While the trial court's decision did not prohibit petitioner from remarrying, it did make that choice much less attractive, forcing her to choose between a new husband in Florida and her children in Illinois"). In its written opinion, the trial court stated that "there is no reason why [respondent] and Mr. Mayer cannot make a life together in Illinois, except that Mr. Mayer chooses not to." Ironically, if Mayer

moved to Illinois, the children could end up living more than three hours away, because Mayer testified that he would want to live in the southern part of the state. See Main, 361 Ill. App. 3d at 990 (section 609 of the Act does not apply to intrastate transfers and a custodial parent need not obtain permission from a court before moving to another location within Illinois). This would hardly be a better outcome than granting respondent's request to remove the children to Wisconsin.

In light of the Eckert factors and the other relevant factors in this case, respondent's request for removal should have been granted. Affirming the trial court's decision in this case forces respondent to choose between marrying a man who lives three hours away and remaining with her children in Illinois, despite evidence that the move to Wisconsin would enhance the general quality of life for both respondent and her children. With respect to visitation, the bottom line is a reasonable change in the visitation schedule, given the short distance of the move. Instead of interpreting the best interests of the children in a way that impedes respondent from exercising a reasonable desire to remarry and move out of the state, I believe that the children's best interests would be better served by granting respondent's petition. Because the trial court's finding is against the manifest weight of the evidence, I would reverse the trial court's denial of the removal petition and remand for the limited purpose of setting a visitation schedule.