2020 IL App (2d) 200183-U
No. 2-20-0183
Order filed July 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* P.W., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 18-JA-69 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Nanette W. and | ) | Christopher M. Harmon, |
| Shawn W., Respondents-Appellants.) | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1  *Held*:  Trial court's finding that minor was abused was not against the manifest weight of the evidence.

¶ 2  The circuit court of McHenry County found, after a 10-day hearing that included an *in camera* interview with the minor, P.W., that the minor had been sexually abused by her older brother, C.W.  It therefore made her a ward of the court.  However, the trial court also found that the respondents, her parents Nanette and Shawn W., were complying with services and that it was safe for P.W. to return home to live in the same household with her brother, as she was now requesting.  The court awarded guardianship and custody of P.W. to her parents and closed the

case. The parents now appeal the finding that the abuse occurred, arguing that that finding was against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       P.W. was born in October 2005. Her older brother C.W. was born in August 2003. P.W. also had another brother, B.W., who was a few years older than C.W., and an older sister.

¶ 5       P.W.'s mother testified that she noticed a change in P.W. during the fall and winter of 2017 that led her to contact the school counselor, who began working with P.W. P.W. was hospitalized for depression and suicidal thoughts in March 2018. She was released after about 10 days.

¶ 6       On September 4, 2018, P.W. refused to leave her mother's car when she arrived at school and the presence of police was required to get her into the school. Once inside, P.W. told the school counselor that she had been sexually abused by C.W. P.W., who was 12 years old, was tearful and sad. She said that her parents did not know and she had not told anyone else. The last time the abuse occurred was in November 2017. The school counselor called the Department of Children and Family Services (Department) hotline to report the abuse.

¶ 7       What ensued is described in the trial court's 44-page memorandum opinion and order dated September 19, 2019, which included a detailed summary of the evidence presented at the lengthy hearing in this case, and the trial court's reasons for finding that P.W. more likely than not was sexually abused by C.W. The evidence included the testimony of the following people: the school counselor; the Department's child protective investigator and caseworkers who interviewed P.W. and her parents and brothers; a certified nurse practitioner and a medical doctor who examined P.W. and found physical evidence of a healed fissure in her vaginal area and who opined that it was suspicious of sexual penetration, and although not conclusive was highly suggestive of and consistent with sexual abuse; the trained forensic interviewer at the Child Advocacy Center (CAC)

who conducted two interviews of P.W.; the police detective (trained in victim-sensitive interview techniques) who responded to the school and later interviewed C.W.; P.W.'s therapist, who also saw Nanette and Shawn in some counseling sessions and during supervised visits; and Nanette, Shawn, and C.W. The evidence also included the videos of the CAC interviews as well as the anatomical charts marked by P.W. during those interviews; the therapists' notes; the Department's notes of its investigation and contacts during the case; and the trial court's *in camera* interview with P.W.

¶ 8    Ordinarily, we would proceed to lay out that evidence here, as the gist of the appeal is the respondents' assertion that the trial court's finding of abuse was against the manifest weight of the evidence. We omit our usual procedure for two reasons. First, almost all of the evidence was filed under seal (as was the trial court's memorandum opinion and order), and we are reluctant to delve into that evidence in this public disposition any more than is necessary. Second, it is not necessary for us to describe the evidence of abuse in detail, because the respondents contest almost none of the trial court's description of that evidence. (They point to only one factual error in the trial court's recitation of the evidence contained in its memorandum opinion and order.) We therefore lay out here only a bare-bones account of facts relevant to the arguments raised on appeal.

¶ 9    To the school counselor, the CAC forensic interviewer, the Department investigator, and her therapists, P.W. gave consistent accounts of sexual abuse by her brother C.W. (and lesser abuse by her brother B.W.). P.W. also stated that she felt her mother did not believe her report of the abuse, a statement that was consistent with Nanette's own statements to police and therapists, which displayed doubt about P.W.'s veracity. P.W. stated that she did not want to live at home with her family and C.W. The Department arranged for her to stay at a friend's house overnight and then to stay with another family friend. C.W. was charged as a juvenile with one count of

criminal sexual assault and three counts of aggravated criminal sexual abuse. He was subject to home detention that included a safety plan prohibiting him from having any contact with P.W.

¶ 10    In October 2018, the State filed a petition for adjudication of wardship, alleging that P.W. was abused and neglected. Among other things, the State alleged that, when driving P.W. to counseling appointments in late September, Nanette had blamed P.W. for getting C.W. into trouble. After a shelter care hearing, P.W. was placed in a foster family. In her counseling sessions during the next couple of months, P.W. remained steadfast in her statements that the abuse occurred and that she did not want to return home, not even for Thanksgiving. By December, however, she expressed worry that C.W. was mad at her and said she missed her family.

¶ 11    In a January 2019 counseling session, P.W. was told that her brother's trial on the sexual abuse charges would be held soon and that she would have to testify. P.W. appeared stunned by the news. She later stated that she blamed herself for the sexual abuse and felt it was her fault for saying something. (However, she did not deny that the abuse occurred.) There was evidence that, during the period before C.W.'s trial, P.W. was told that her brothers would be sent to jail, that they would be required to register as sex offenders, and that their futures would be seriously adversely affected. P.W. was also told that, if she did not testify at C.W.'s trial, he could not be found guilty. The therapists' notes from January reflect that P.W. was stressed and anxious about appearing in court. She was scared, and worried that she would not be able to speak in court. In early February 2019, P.W. was hospitalized for 10 days for suicidal behaviors.

¶ 12    C.W.'s delinquency trial on the sexual abuse charges took place in April 2019. P.W. recanted her earlier account of the sexual abuse and said that nothing had happened. C.W. was acquitted.

¶ 13    Despite her in-court recantation, in her later counseling sessions P.W. did not say that she had lied about the sexual abuse.  However, she also expressed a desire to go home. She expressed anxiety about how her family members viewed her and occasional anxiety about her safety.

¶ 14    The trial of the petition for adjudication began in June 2019 and extended over portions of 10 days, ending in August 2019.  The evidence received by the court included expert testimony that the presence of a healed fissure such as the one in P.W.'s vaginal area was unusually strong evidence of sexual abuse; about 95% of children known to have been sexually abused did not show physical evidence of abuse.  The healed fissure could not have been caused by a tampon or scratching.  It could have been caused by a direct impact of sufficient force on the bar of a bicycle. There was no evidence of any such accident.  As an expert in psychological aspects of child sexual abuse, P.W.'s therapist testified that recantation was common; 85% of known child sex abuse victims recanted their allegations of abuse.  Also relevant to this appeal was P.W.'s partial recantation of her initial disclosures during the *in camera* interview.  P.W.'s *in camera* description of what C.W. had done differed from both her initial disclosures and her later complete recantation during C.W.'s criminal trial.

¶ 15    After the trial court issued its memorandum opinion and order finding that the State had met its burden to prove that P.W. more likely than not was abused by C.W., the respondents moved for reconsideration.  The trial court issued another memorandum opinion and order, detailing its reasons for denying that motion.  Accordingly, P.W. remained a ward of the court.  However, the trial court also found that the respondents were fit, able and willing to care for and protect P.W.; that the respondents were complying with the recommended services (individual and family counseling); that P.W.'s health, welfare and safety would not be compromised by leaving her in

the home in the custody and guardianship of her parents; and that it was "no longer in the best interests of the minor nor the public that the case remain open." It closed the case.

¶ 16                                    II. ANALYSIS

¶ 17    The respondents appeal, arguing that the trial court's finding of abuse was against the manifest weight of the evidence. They argue that the finding was based on a determination that C.W. committed a sex offense against P.W., but the evidence did not prove that any sex offense had occurred.

¶ 18    On a petition to adjudicate a minor as abused, the State bears the burden of proving the abuse by a preponderance of the evidence, that is, it must prove that the allegations of abuse are more probably true than not. *In re A.P.*, 2012 IL 113875, ¶ 17. In a bench trial such as the hearing on such a petition, the trial court sits as the trier of fact, hearing the witnesses and reviewing the direct presentation of the evidence, and it is in the best position to make credibility determinations and factual findings. *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007). We therefore will not reverse the trial court's findings unless they are against the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007); see also *A.P.*, 2012 IL 113875, ¶ 17.

¶ 19    As we have noted, the respondents do not contest the vast majority of the evidence described by the trial court in its memorandum opinion and order finding abuse. Instead, they argue that this evidence did not meet the State's burden of proving the statutory requirements for a finding of abuse.

¶ 20    To prove abuse as it was alleged here, the State was required to prove that a sex offense was committed against P.W. 705 ILCS 405/2-3(2)(iii) (West 2016). The trial court did not identify

which sex offense it found had been proven, but there are at least two likely contenders. Under section 11-1.60(b) of the Criminal Code of 2012 (Code), "[a] person commits aggravated criminal sexual abuse if that person commits an act of sexual conduct with a victim who is under 18 years of age and the person is a family member." 720 ILCS 11-1.60(b) (West 2016). Alternatively, under section 11-1.50(b) of the Code, "[a] person commits criminal sexual abuse if that person is under 17 years of age and commits an act of sexual penetration or sexual conduct with a victim who is at least 9 years of age but under 17 years of age." *Id.* § 11-1.50(b). For purposes of the statute, "sexual contact" is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1.

¶ 21    The respondents argue that, under either of these possible sex offenses, the State was required to prove either (1) that C.W.'s actions were for the purpose of sexual gratification of himself or P.W., or (2) that C.W. committed an act of penetration against P.W. They contend that there was no evidence of either. Accordingly, they argue, the finding of abuse cannot stand. Both arguments, however, rest on a selective view of the evidence.

¶ 22    The trial court found that there was sufficient circumstantial evidence that C.W. had acted for the purpose of sexual gratification. One item of evidence cited by the trial court in reaching that conclusion was C.W.'s age; the trial court stated that he was 15 years old in November 2017 (the time of the most recent incident of abuse). The trial court noted that the closer an accused is to the age of majority, the more plausible it is for a court to infer that the accused acted for the purpose of sexual gratification. What in a younger child may be innocent touching or exploration, in an older child is more likely to have a sexual purpose. See *In re Donald R.*, 343 Ill. App. 3d

237, 247 (2003) (Holdridge, J., specially concurring). The respondents point out that C.W. was actually only 14 years old at the time of the most recent incident, not 15 as the trial court believed. They assert that this error by the trial court is sufficient to show that its finding of sexual gratification is against the manifest weight of the evidence.

¶ 23    "[T]he issue of intent of sexual gratification in minors must be determined on a case-by-case basis. There can be no bright-line test. The fact finder must consider all of the evidence, including the offender's age and maturity, before deciding whether intent can be inferred." *In re Matthew K.*, 355 Ill. App. 3d 652, 656-57 (2005). In this case, C.W.'s age was not the only relevant evidence on the issue of whether he acted for the purpose of sexual gratification. There was evidence of repeated incidents of touching extending over years and physical evidence that suggested penetration, as well as P.W.'s statements and markings of anatomical charts that indicated genital-to-genital contact. Viewing the evidence in its entirety, the trial court's finding that C.W. acted for the purpose of sexual gratification was not against the manifest weight of the evidence.

¶ 24    Moreover, even if the basis for the trial court's finding was weakened by its error regarding C.W.'s age, the evidence of sexual penetration was sufficient to sustain the finding of abuse. As we noted, when the accused is younger than 17 years old and the victim is between the ages of 9 and 17, the offense of criminal sexual abuse requires proof only of *either* sexual penetration *or* conduct undertaken for the purpose of sexual gratification, not both. See 720 ILCS 11-1.50(b) (West 2016). Thus, the necessary proof that a sex offense was committed could be met by evidence of sexual penetration, even without any evidence of sexual gratification. (And as the State notes, when a sex offense involves an act of penetration, the purpose of sexual gratification can be

inferred. See *People v. Kolton*, 219 Ill. 2d 365, 370 (2006) (acts of sexual penetration are inherently sexual in nature and can be neither inadvertent nor innocent)).

¶ 25     "Sexual penetration," as defined in the Code, includes any contact, however slight, between the sex organ or anus of one person and the sex organ or anus of another person, or any intrusion, however slight, of any part of the body of one person into the sex organ or anus of another person. 720 ILCS 11-0.1 (West 2016). In her CAC interviews, P.W. described (verbally and by referring to the anatomical charts) multiple instances of such contact. She also stated that C.W. touched her both inside and outside her vagina and anus. Further, her physical examination revealed a healed fissure at the base of P.W.'s vaginal opening, which the doctor opined was the result of trauma and suggested sexual penetration. This evidence amply supports the trial court's finding that a sex offense occurred. The respondents' only argument on this point is that P.W. never stated that C.W. placed his penis in her vagina. However, as the statutory definition of "sexual penetration" makes clear, the State need not show that that specific type of penetration occurred.

¶ 26                                    III. CONCLUSION

¶ 27     For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 28     Affirmed.