No. 2-09-0439     Filed: 8-9-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| NANCY PRIGNANO, Individually and as Mother and Next Friend of Marissa L. Prignano, a Minor, and as Trustee of the Trust for the Benefit of Marissa L. Prignano and Danielle L. Prignano, | ) ) ) ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CH--1227 |
| LOUIS H. PRIGNANO, Individually and as Independent Executor of the Estate of George L. Prignano, Deceased, and as Trustee of the Prignano Children's Trusts, | ) ) ) ) ) ) | |
| Defendant-Appellant | ) ) | |
| (The Estate of Danielle L. Prignano, Deceased, by Nancy Prignano, Administrator, Plaintiff/Intervenor-Appellee). | ) ) ) | Honorable Thomas C. Dudgeon, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

This case concerns the disposition of George Prignano's business and personal interests after his death in July 2000. George owned several businesses with his brother, Louis Prignano, the defendant. George's second wife, Nancy, alleges that George and Louis agreed that, upon the death of either of them, the survivor would buy out the other's share of the businesses from his heirs, using the proceeds from life insurance policies purchased for that purpose. Nancy also alleges that she and Louis had an oral agreement to the same effect, i.e., that Louis would purchase George's share of the

companies from her in exchange for the insurance proceeds. However, she alleges that, upon George's death, Louis (who was the executor of George's estate) kept both George's share of the businesses and the insurance proceeds, without telling her. She brought suit against Louis on behalf of herself and her children, asserting the same claim under a variety of legal theories, including fraud, breach of fiduciary duty, breach of contract, and unjust enrichment. After a bench trial, the circuit court of Du Page County found in the plaintiffs' favor on the breach of fiduciary duty, breach of contract, and unjust enrichment claims, and entered judgment in their favor in the amount of $615,324.50 ($450,000 as a unitary recovery on all of those claims, and $165,324.50 in prejudgment interest on that recovery). Louis appealed, arguing that Nancy had not proved her claims for a variety of reasons. We affirm in part and vacate in part.

FACTUAL AND PROCEDURAL BACKGROUND

The brothers were business partners over a period of years. They shared equally the ownership of two corporations, Sunrise Homes and Rainbow Installations, and were equal partners in the 710 Building Partnership. The brothers were customers of Charles Kenny, a self-described "insurance/financial person." Kenny testified that, in 1985, George and he discussed a buy-sell or "business continuation agreement," by which he meant an agreement setting the terms on which the business would continue in the event of the death or disability of a partner or shareholder. The agreement could be funded with insurance proceeds, among other things. He gave George a book (provided by an insurance company) containing a blank sample business continuation agreement. In March 1985, the brothers took out two life insurance policies, one on each brother's life. Each policy was for $60,000 and named Rainbow Installations as the beneficiary. It was Kenny's understanding that the proceeds would be used to fund a business continuation agreement. In November 1990, the

brothers took out two more policies through Kenny, each in the amount of $50,000. These policies named Sunrise Homes as the beneficiary. Kenny believed that Sunrise Homes paid the premiums on these policies. In 1999, George had a conversation with Kenny in which George said that the brothers' accountant, Ralph Antignoli, had advised them that, in light of the increased value of the companies, they would need substantially more insurance proceeds to fund a buy-sell agreement for the companies. At George's request, Kenny helped the brothers purchase two larger policies from North American in the amount of $500,000 each. Again, both policies named Sunrise Homes as the beneficiary. Kenny was present when both brothers signed the applications, and he witnessed their signatures. Later, 710 Building Partnership was added as a beneficiary of these policies.

Kathleen Steinkuller, a realtor who was close to George for several years, testified that George had a close relationship with his children from his second marriage and wanted to make sure that they were provided for in the event of his death. George told her that he had provided for his children through insurance. George also told her, within a year before his death, that he had a buy-sell agreement with Louis. According to Steinkuller, George said that, if you have a company with partners, you have to protect your partner if something happens to you. As a result, Steinkuller testified, George and Louis "always were talking to an insurance man it seemed." Vanessa Paladino, the secretary for the brothers' businesses, testified that the brothers discussed the issue of a buy-sell agreement more than once in her presence, and she believed that on one occasion Kenny was present. Antignoli, the accountant for the brothers' businesses, testified that "over the years" he had commented to both brothers that it would probably be a good idea to get a buy-sell agreement and fund it with some insurance.

George died on July 12, 2000. Antignoli testified that, as of shortly before George's death, the net value of Sunrise Homes was approximately $1.2 million.

Louis was appointed the executor of George's estate. George's will benefitted Louis, Nancy, the two children from George's first marriage, and Danielle and Marissa, the two children from his marriage with Nancy. It contained specific bequests of money and property to the children from his first marriage. It bequeathed to Nancy "all my interest" in the home he had shared with her at 445 North Elizabeth in Lombard, along with "any remaining cash or IRA accounts." It bequeathed the "assets of Sunrise Homes Inc. and any life insurance held by any co[mpany] we may own" to Louis. The will directed that the residue of the estate be distributed 50% to Nancy, 25% to a trust for the children from his first marriage (of which Louis was the trustee), and 25% to a trust for Danielle and Marissa (of which Nancy and Louis were cotrustees). Louis filed an inventory of the estate on August 17, 2000, listing among the assets: a half interest in Sunrise Homes, valued at $200,000; a half interest "cash contribution of Rainbow Insulation [sic]," valued at $7,500; and a half interest in 710 Building Partnership, valued at $200,000.

Nancy testified that, in the weeks following George's death, she was upset and confused, and she looked to Louis to manage George's estate and make decisions because he was the executor. She testified that a week or two after George's death she had a telephone conversation with Louis in which Louis stated that he and George had not wanted any wives involved in the businesses, and Nancy stated that she did not want to be involved in the businesses. Nancy testified that Louis told her that that was what the insurance proceeds were for, to buy out her interest in the businesses. Nancy testified that she and Louis agreed during this conversation that she would give Louis the share of the businesses that had belonged to George in return for the proceeds from the insurance.

North American initially rejected the claim for the $500,000 life insurance policy in George's name, apparently on the basis that George had not disclosed that he was a smoker. On July 24, 2000, an insurance claims agent met with Nancy and Louis to interview them. A few days earlier, Kenny had completed a written statement that said that, at the time of the 1999 policy application, George had indicated that he was not a smoker but smoked cigars, and that George had approached Kenny to purchase the policy "on advice from accountant to fund buy and sell agreement." Nancy told the agent that George smoked only occasionally. During the interview, Louis stated that "at this point" he and Nancy were both partners in the firm that was the beneficiary of the policy, i.e., Sunrise Homes. At trial, Nancy testified that her oral agreement with Louis was why she attended the meeting with the insurance claims agent and that she would not have done so if she had not believed that she had an interest in the insurance proceeds.

Louis and Kenny testified that, about August 21, 2000, Louis came by while Kenny was meeting with Nancy in her home. Nancy's brother was also present. Louis brought with him a blank copy of a sample buy-sell agreement from the book that Kenny had given the brothers years ago. Louis testified that he wanted to reach an agreement with Nancy about the ownership of the companies. He showed her the blank buy-sell agreement and asked her, "if we can do this, do you want to do this?" Nancy read through the agreement and said okay.

Louis testified that he returned to his office and, at some point, directed Paladino to fill in the blank buy-sell agreement he had shown Nancy. He instructed Paladino regarding how to fill in the blanks and gave her the amounts of the insurance proceeds to put in. The document stated that it was an agreement between George and Louis as the "stockholders" of Sunrise Homes, 710 Building Partnership, and Rainbow Installations. The agreement provided that upon the death of either of

them, the survivor would have the right to purchase the decedent's half of the companies for $600,000, and that the agreement would be funded by three life insurance policies: two John Hancock policies in the amounts of $50,000 and $60,000, and a North American policy for $500,000. Louis then signed the document as secretary, and he asked an acquaintance who happened to be in the office at the time to witness his signature. Paladino also witnessed the document at his request. Louis instructed Paladino to sign the document using George's name, and she did so, although she later stated that she felt this was "wrong." George's "signature" listed him as the president of the three companies. The document was dated October 1, 1999, several months before George's death. Louis testified that, after his attorney told him that the agreement could not be used, he put it aside.

Several years before his death, George had purchased from Sunrise Homes some vacant property (eventually designated as 445 North Elizabeth), on which he and Nancy built a home. At some point, however, the property had been resubdivided, and a portion of the property was not transferred to George and remained titled under Sunrise Homes. Louis testified that, although it was not reflected in the buy-sell agreement he had asked Paladino to fill in after George's death, he and Nancy had a verbal agreement that Nancy would use the insurance proceeds to purchase from Sunrise Homes the remaining portion of 445 North Elizabeth. Thus, in Louis's view, his verbal agreement with Nancy was that he would get George's share of the businesses and the insurance proceeds, and she would get her home.

John Hancock paid out the benefits under the two smaller insurance policies by August 2000. In May 2001, Louis settled the claim with North American for $335,000. Louis testified that none of the proceeds from the three insurance policies was ever paid to Nancy and that he did not tell Nancy that he had received the insurance proceeds. Louis did not list the insurance as an asset of

George's estate on any of the documents he filed as executor. Louis filed a final accounting on December 18, 2001, showing that: as to Sunrise Homes, one half of all outstanding shares of stock (valued at $186,285) had been distributed to Louis; as to Rainbow Installations, $7,500 (one half of the company's cash on hand) had been "paid by Louis H. Prignano to the Estate"; and as to 710 Building Partnership, "all property was in land trust with beneficiary being Louis H. Prignano and not part of Estate." The property at 445 North Elizabeth was to be conveyed in kind to Nancy, and Nancy was also listed as receiving $1,000 of personal property (conveyed in kind) and a spouse's award of $45,000. Danielle and Marissa each received a minor's award of $5,000. George's two children from his first marriage each received specific bequests of approximately $39,000 in cash, and one child received some real estate. The estate was closed on February 15, 2002. Nancy filed no claims against the estate and did not file any objection to the inventory or final accounting. Nancy testified that, at the time the estate closed, she believed that Louis had not yet received the insurance proceeds and that he would honor their oral agreement. In March 2002, the portion of 445 North Elizabeth owned by Sunrise Homes was conveyed to Nancy.

Nancy testified that, in April 2003, she had a conversation with Denise Weaser, the sister of George and Louis, in which Denise told her that Louis had received the insurance proceeds. In August 2003, Nancy received an anonymous letter telling her the same thing. Nancy filed suit against Louis on September 1, 2004. The original complaint alleged the existence of the oral buy-sell agreement between the brothers and alleged that Louis committed fraud and breached his fiduciary duties. The complaint was amended from time to time. Danielle died in January 2006. Nancy was appointed as the administrator of her estate, and on May 18, 2006, she was granted leave to intervene in the case on behalf of Danielle's estate, and filed an intervening complaint. The first time that any

of the complaints alleged the existence of an oral contract between Nancy and Louis was on May 18, 2007. By the time of trial, the claims against Louis included fraud, breach of fiduciary duty, breach of the oral contract between the brothers (brought on a third-party beneficiary theory), breach of the oral contract between Nancy and Louis, and unjust enrichment.

On July 18, 2008, following a lengthy trial, the trial court found that Nancy had not proved her fraud or third-party beneficiary claims, but found in her favor on the remaining claims. The trial court began by finding that the brothers had entered into an oral buy-sell agreement, the terms of which were accurately reflected in the false written "agreement" that Louis created at his office after George's death. The trial court also found that an oral agreement existed between Nancy and Louis, to the effect that she would give him her portion of George's former share of the businesses in exchange for the insurance proceeds. The trial court then ruled on each of Nancy's specific claims and entered judgment on those claims: a recovery of $300,000 to Nancy individually, $75,000 to Nancy as next friend of Marissa, and $75,000 to Nancy as administrator of Danielle's estate.

Thereafter, Louis filed a posttrial motion seeking reconsideration of various aspects of the judgment. Nancy filed motions seeking costs and prejudgment interest from February 15, 2002 (the date that George's estate was closed), through the date of the judgment, and requesting leave to file amended complaints seeking such interest. In addition, on October 21, 2008, Nancy filed a motion for additur. On February 17, 2009, the trial court ruled in favor of Nancy and against Louis on most of the pending motions but stated that a final order would not be entered until two weeks later. On February 24, 2009, Nancy filed amended complaints, in the chief case and as administrator of Danielle's estate, seeking prejudgment interest. On March 3, 2009, Louis filed a motion to vacate that part of the February 17 order awarding prejudgment interest to Danielle's estate. On March 24, 2009,

the trial court entered an order (1) clarifying that its February 17 order had granted Nancy leave to file both of the most recent amended complaints (as administrator as well as on behalf of herself and Marissa) and clarifying the breakdown of the damages awards in its July 18, 2008, order; (2) granting costs in the amount of $2,893; (3) granting Nancy prejudgment interest in the total amount of $162,431.50 ($108,287.68 on her individual damages award and $27,071.91 on the award for each of her daughters); and (4) finding that there was no just reason to delay enforcement or appeal of its order. Louis filed a timely notice of appeal.

## ANALYSIS

Louis raises eight arguments on appeal, attacking both the trial court's finding of liability on the claims for breach of fiduciary duty, breach of contract, and unjust enrichment, and its rulings related to the award of prejudgment interest. We take each argument in turn.

### Breach of Fiduciary Duties

The trial court found that Louis owed Nancy and her children fiduciary duties in three capacities: as executor of George's will, as cotrustee of her children's trust under the will, and as an officer and partner in the businesses they were to receive under the will. The trial court found that the brothers' buy-sell agreement "required Lou in his fiduciary capacities as a corporate officer, partner and executor to honor the buy-sell agreement and to trade the insurance proceeds he received in exchange for Nancy's and the children's inherited interests in the businesses." The trial court further found that Louis breached his fiduciary duties by failing to provide the plaintiffs with the insurance proceeds despite his assertion of control over their share of the businesses. On appeal, Louis argues that the trial court erred in finding that the brothers had an oral agreement, and in finding that the plain language of the will did not absolve him of any duties with respect to the insurance proceeds.

As to the first argument, the issues of whether a contract existed, the parties' intent in forming it, and its terms are all questions of fact to be determined by the trier of fact. Hedlund & Handley, LLC v. Board of Trustees of Community College District No. 508, 376 Ill. App. 3d 200, 205 (2007). We review the trial court's findings of fact with deference and will reverse only if they are against the manifest weight of the evidence, that is, "the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." Samour, Inc. v. Board of Election Commissioners of the City of Chicago, 224 Ill. 2d 530, 544 (2007). Louis argues that the trial court's findings as to the existence and terms of the brothers' oral agreement are against the manifest weight of the evidence because there was no direct evidence of the agreement's existence, the brothers never reduced the agreement to writing during George's lifetime, and George's will did not refer to the agreement.

Reviewing the record, we find that there is ample evidence supporting the trial court's findings regarding the existence and terms of the brothers' oral buy-sell agreement. Kenny, Antignoli, Paladino and Steinkuller all testified that they had heard George (or both George and Louis) refer to such an agreement. Moreover, the brothers repeatedly purchased insurance that Kenny understood was for the purpose of funding their buy-sell agreement. In addition, Nancy testified that Louis told her that the purpose of the insurance was so that he could buy out George's heirs' interests in the businesses after George's death. This evidence was subject to the trial court's determinations regarding credibility. In a bench trial, the trial court sits as the trier of fact, hearing the witnesses and reviewing the direct presentation of the evidence, and it therefore is in the best position to make credibility determinations and factual findings. In re Marriage of Matchen, 372 Ill. App. 3d 937, 946 (2007). This court will not reweigh the evidence or second-guess the trial court's credibility determinations, especially where, as here, the evidence amply supports the trial court's conclusions.

The trial court's findings regarding the existence and terms of the brothers' oral agreement are not against the manifest weight of the evidence.

Louis also argues that the words of the will were the sole matter before the court, and that the plain meaning of those words could not be varied by extrinsic evidence, such as the evidence of the brothers' agreement. See In re Estate of Goodkind, 356 Ill. App. 3d 607, 614 (2005) ("extrinsic evidence may not be used to contradict the clear import of the testator's words, to add terms and provisions, or to otherwise reform the will"). Because he carried out the dispositions in the will, Louis contends, he cannot be liable for breach of fiduciary duty based upon an alleged agreement that was contrary to the will.

Although the legal principle Louis cites is correct, his application of it to this case is not. Louis's fiduciary duties as executor flowed to those who were beneficiaries of the will and included the duty to properly carry out the provisions of the will. In re Estate of Lis, 365 Ill. App. 3d 1, 9-10 (2006). George's will bequeathed to Louis the "assets of Sunrise Homes."[1] However, it did not mention, nor did it give Louis, George's stock in Sunrise Homes. Shares of stock are units of

---

[1] It is doubtful that George had the power to convey Sunrise Homes's corporate assets (which, after all, belonged to Sunrise Homes rather than to him personally) via a provision in his will. See Bergheger v. Boyle, 258 Ill. App. 3d 413, 416 (1994) (a will cannot convey property that does not belong to the testator). Thus, it is possible that the bequest to Louis of Sunrise Homes's assets and the insurance proceeds (which were likewise assets of the businesses named as beneficiaries in the policies, not George's personal assets) was ineffective to convey good title in those assets to Louis. However, the parties have not explored this argument at any length on appeal, and so we do not pursue it further.

ownership of a corporation (805 ILCS 5/1.80 (West 2008)); once they have been issued and are held by a shareholder, they are not the same as the assets of a corporation (see People v. Rosehill Cemetery Co., 371 Ill. 510, 515 (1939) (an interest in corporate property is not the same as a share of stock in the corporation)). Nor did the will make any specific bequest of George's share of the other businesses he owned with Louis. Thus, George's ownership and management interests in those businesses were part of the residue of the estate, and were to be distributed under the will's residuary clause, 50% to Nancy, 25% to the trust for the children from George's first marriage, and 25% to the trust for Danielle and Marissa. However, in the final inventory, Louis stated that George's stock in Sunrise Homes had been distributed to himself, in contravention of the residuary clause. Nor did the final inventory mention George's ownership interests in the other businesses, although, under the terms of the will, they should have been distributed via the residuary clause. Accordingly, even if the brothers' agreement had never been considered by the trial court, there was clear evidence that Louis breached his fiduciary duty as executor to carry out the express provisions of the will, as well as his fiduciary duty as trustee of the children's trusts to secure for them the property that should have formed the res of their trusts.

Moreover, Louis owed Nancy and the children (through their trusts)--those who, under the will, together held what had formerly been George's share of the ownership of the businesses--a fiduciary duty as a corporate officer of Rainbow Installations and Sunrise Homes, and as a partner with them in 710 Building Partnership. This duty required Louis "to exercise the highest degree of honesty and good faith in the dealings and in handling of business assets, thereby prohibiting enhancement of [his] personal interests at the expense of the interests of the enterprise" or of other stockholders or partners. Hagshenas v. Gaylord, 199 Ill. App. 3d 60, 71 (1990) (owner of 50% of

the stock in a close corporation owes this duty, just as a partner in a partnership would). It is perhaps debatable whether this duty required Louis to honor his oral buy-sell agreement with George after George's death (although the terms of the agreement were such that it was exactly such a death that the parties intended would trigger the obligations of the surviving party to perform). There is no doubt, however, that Louis's duty to exercise "the highest degree of honesty and good faith" in his dealings with the other shareholders or partners, viz., Nancy and the children, prohibited him from asserting control over their share of the businesses without compensating them. Thus, the evidence supports the trial court's finding that Louis breached his fiduciary duties in this respect as well. We find no error in the trial court's determination that Louis breached his fiduciary duties toward the plaintiffs.

Timeliness of Breach of Oral Contract Claim

In count IV of her fifth amended complaint, filed on May 18, 2007, Nancy for the first time asserted a claim that Louis had breached their oral contract that was allegedly formed shortly after George's death. (The claim was also raised in the amended intervening complaint filed on the same date.) Louis attacked this claim on two grounds: that the claim was barred by the statute of limitations, and that the oral contract never existed. The trial court held that the claim was timely, and that the oral contract existed under the terms that Nancy described in her testimony. On appeal Louis challenges both determinations, beginning with the timeliness of the claim.

The trial court noted that, under Illinois law, a claim for breach of an unwritten contract must be brought within five years of the date on which the claim accrued. 735 ILCS 5/13--205 (West 2008). Louis argued, and the trial court agreed, that the latest date on which Nancy's claim could have accrued was February 15, 2002. The trial court observed that, "[b]y that time[,] the businesses

-13-

had received all of the insurance benefits and the final accounting should have disclosed that they had been paid to Lou" and that Louis was able to honor his agreement with Nancy at that point but chose not to do so. However, the trial court found that Nancy's claim regarding Louis's breach of the contract with her was "derivative" of the buy-sell agreement between the brothers, and therefore was sufficiently closely related to the timely pled allegations regarding the brothers' agreement that it "related back" to her initial assertion of a claim for breach of the brothers' agreement, which occurred within five years after the estate closed. See 735 ILCS 5/2--616(b) (West 2008). We review de novo a trial court's determination that a claim pled outside the ordinary limitations period "relates back" to a previously filed claim. Porter v. Decatur Memorial Hospital, 227 Ill. 2d 343, 353 (2008).

The correctness of the trial court's application of the "relation back" doctrine is not entirely clear. In order to relate back, a new claim must arise from the "same transaction or occurrence" as the claim asserted earlier. 735 ILCS 5/2--616(b) (West 2008). The requirements of section 2--616(b) of the Code of Civil Procedure are to be construed liberally, and "the new allegations need not be based on the same specific facts of the prior allegations." Porter, 227 Ill. 2d at 354. However, the defendant must have received fair notice of the substance of the new claim within the limitations period on that claim, and the earlier allegations must be sufficient to have directed the defendant's attention to the facts that form the basis of the new claim. Porter, 227 Ill. 2d at 355. "[A]n amendment which states an entirely new and distinct claim for relief based on completely different facts will not relate back." Porter, 227 Ill. 2d at 359. In Porter, the supreme court adopted the sufficiently-close-relationship test and ruled that "a new claim will be considered to have arisen out of the same transaction or occurrence and will relate back if the new allegations as compared with

the timely filed allegations show that the events alleged were close in time and subject matter and led to the same injury." Porter, 227 Ill. 2d at 360.

Here, the timely filed pleadings alleged that George and Louis had an oral contract dating from 1985 that provided that, upon the death of either of them, the survivor would buy out the decedent's heirs using insurance proceeds. However, there was no claim related to, or even any mention of, an oral contract formed in 2000 between Louis and Nancy. Although the two oral agreements concerned the same subject matter (the insurance proceeds and the ownership of the businesses), they involved different parties and took place at different times. Thus, Nancy's claim for breach of her oral agreement with Louis rests on different facts than her earlier claim, and it is debatable whether it passes the sufficiently-close-relationship test.

However, we may affirm on any basis appearing in the record. City of Chicago v. RN Realty, L.P., 357 Ill. App. 3d 337, 344 (2005). Under the "discovery rule," a party's cause of action is held to have accrued "when the party knows or reasonably should know of an injury and that the injury was wrongfully caused." Clay v. Kuhl, 189 Ill. 2d 603, 608 (2000). The discovery rule applies to actions involving "tort, tort arising from contract, or other breach of contractual duty." Hermitage Corp. v. Contractors Adjustment Co., 166 Ill. 2d 72, 79 (1995). Although whether a party's claim was filed within the applicable limitations period after she discovered her cause of action is generally resolved as a question of fact, it may be resolved as a question of law when the facts are undisputed and the outcome is clear. Clay, 198 Ill. 2d at 609-10.

Here, our review of the record shows that Nancy's claim for breach of her oral agreement with Louis accrued, not in February 2002 when the estate closed, but in April 2003, when she first received information that Louis had already received the insurance proceeds. Although the final

inventory for the estate disclosed that Louis had conveyed to himself his dead brother's shares in the businesses, Nancy testified that she believed that the insurance payout was still being disputed and that Louis would honor his agreement with her. The final inventory did not mention the insurance proceeds, but it did not need to: insurance proceeds are paid directly to the designated beneficiary and therefore generally do not pass through probate. Bergheger, 258 Ill. App. 3d at 416. There is no evidence that Nancy had any reason to suspect that Louis had already received the insurance proceeds until she was told this in April 2003. Thus, application of the discovery rule here involves no disputed facts and demonstrates that Nancy's claim for breach of her oral contract with Louis was filed within five years of the date on which her claim accrued.

At oral argument, Louis argued that Nancy should have known that Louis would not honor their agreement to pay her the insurance proceeds when she was told by Thomas Breen (the attorney for George's estate) that the insurance proceeds would be paid to Louis (through Sunrise Homes), not to her. Breen testified that he spoke with Nancy about the estate twice. The first occasion was at a September 2000 meeting of all of the heirs and legatees under George's will. Louis, Nancy, Nancy's brother or brother-in-law, and George's two children from his first marriage were present. At the meeting, according to Breen:

"We went through the will. And at that time I indicated that the insurance would ultimately go to Lou through the Sunrise--that he would get the assets of Sunrise."

However, this information was consistent with Nancy's belief that she and Louis had an agreement and that when Louis received them he would pay her the insurance proceeds in return for her share of the businesses. Thus, this first meeting did not put Nancy on notice that Louis did not intend to pay her the proceeds. The second occasion was approximately one year later, in August or

September 2001, when at Louis's request Breen met with Nancy and her brother to go over the final inventory with her. Breen testified that Nancy became upset and walked out a short time after he began going over the inventory. Breen did not testify as to what he told Nancy before she walked out. By the time of this second meeting, Louis had received the insurance proceeds, but the record does not reflect that Breen disclosed this fact to Nancy. Rather, Breen stated that he did not discuss the insurance proceeds with Nancy. Thus, this second meeting did not provide Nancy with information that Louis had breached their agreement.

The only evidence in the record regarding when Nancy first knew or should have known about Louis's breach of their agreement was her testimony that Weaser told her in April 2003 that Louis had already received the proceeds of the insurance policies. Louis objected to this testimony as hearsay, but the trial court ruled (correctly, in our view) that the testimony as to Weaser's statement was not hearsay because it was offered not to establish that Louis had in fact received the proceeds, but to show that Nancy had notice of Louis's breach as of the date of that conversation. Kincaid v. Ames Department Stores, Inc., 283 Ill. App. 3d 555, 566 (1996) (a statement that is used to show proof of notice to the hearer, not truth of the substance of the statement, is not hearsay). Louis did not submit any contrary evidence to show that Nancy knew or should have known of Louis's breach at an earlier date. Nancy first added a claim for the breach of this agreement in May 2007, well within the five-year statute of limitations on the claim. Thus, we hold that the claim was not untimely.

The Existence of the Oral Agreement Between Nancy and Louis

Louis argues that the trial court's finding that he breached an oral agreement between himself and Nancy was against the manifest weight of the evidence. He argues that, although he admittedly spoke with Nancy with the intent of reaching an agreement with her about control of the businesses,

they ultimately did not reach any agreement. As noted above, the existence of a contract and its terms are questions of fact to be determined by the trier of fact, and we will not reverse unless the trial court's findings are against the manifest weight of the evidence. Hedlund & Handley, 376 Ill. App. 3d at 205.

In support of his argument, Louis states that his account of the terms of the agreement they discussed differs from Nancy's account, and from this he argues that, as a matter of law, the trial court could not have found the meeting of the minds necessary to form a contract. However, simply because the parties to an agreement now recall the terms of that agreement differently does not mean that there was no meeting of the minds. Where the parties have agreed on the essential terms, such as price and the items to be delivered for that price, a contract has been formed. Jannusch v. Naffziger, 379 Ill. App. 3d 381, 386 (2008). "It is not necessary that the parties share a subjective understanding as to the terms of the contract; the parties' conduct may indicate an agreement to the terms." Jannusch, 379 Ill. App. 3d at 386. Here, the evidence regarding the parties' conduct supports the conclusion that the parties agreed on the items to be conveyed (Nancy's inherited interests in the businesses) and the price to be paid (the insurance proceeds). Louis had Paladino create a buy-sell agreement containing these terms shortly after his meeting with Nancy. In the final inventory of the estate, he listed the business interests as having been distributed to himself, and Nancy (who believed that the payout on the insurance policies had not yet occurred) did not object. Although Louis testified that he had anticipated that he would ultimately retain the insurance proceeds, he stated that this was because of a separate verbal agreement that he claimed to have made with Nancy in which she would trade the insurance proceeds for clear title to 445 North Elizabeth. This testimony supports the inference that, at least initially, both parties contemplated that Nancy would receive the

insurance proceeds in return for giving up her inherited interests in the businesses. Taken together, this evidence was sufficient to support the trial court's conclusion that a meeting of the minds occurred.

Louis also argues that the alleged agreement was not supported by any consideration, but the evidence shows that Nancy agreed to give up, and did give up, her stock and ownership interests in the three businesses at issue. Louis suggests that the stock was worthless because, under the will, he owned all the assets of Sunrise Homes (although, again, it is doubtful that George had authority to transfer corporate assets under his will). There was evidence that George's ownership interests were worth $600,000, however, and Louis did not introduce any evidence that they were worthless. Accordingly, we reject this argument as well.

Finally, Louis contends that there was insufficient evidence of the oral agreement's existence and its terms. However Louis testified that he went to Nancy's home to talk with her because he thought that they needed to have some kind of agreement; that he brought the blank buy-sell agreement because he thought it could be used for an agreement between them; and that after he left Nancy's home he went to his office and had Paladino type in terms showing that Nancy would exchange her share of the three businesses for insurance proceeds totaling $610,000 (albeit via a false "contract" between himself and George). Nancy testified consistently that Louis and she agreed to trade George's share of the businesses for the insurance proceeds. This testimony and the written agreement that Louis had Paladino create both support the inference that Louis agreed to those terms and was willing to put them in writing. Louis argues that the potential agreement was that Nancy would trade her portion of the businesses for clear title to 445 North Elizabeth, and asserts that the insurance proceeds were never part of the deal. However, the trial court specifically found that

"Lou's assertion that he reached an agreement with Nancy to trade her interests in the business for clear title on the house is not believable." We defer to this credibility assessment. Matchen, 372 Ill. App. 3d at 946. For all of these reasons, the trial court's finding of an oral contract between Nancy and Louis is not against the manifest weight of the evidence.

Nancy's Testimony and the Dead-Man's Act

At trial, the trial court permitted Nancy to testify to a conversation she claimed to have had with George in June 2000, in which he told her "about the insurance policy that he had out with him and Louie and that it was a buy/sell, that he would--I would get the house and the insurance and Louis would get the business because they didn't want the wives to be messing with, you know, the business." Louis asserts that this testimony violated section 8--201 of the Code of Civil Procedure, popularly known as the Dead-Man's Act. That statute provides that:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person *** no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased ***[.]" 735 ILCS 5/8--201 (West 2008).

Further, the statute provides that "person directly interested in the action" does not include anyone who is interested solely as an executor, trustee, or similar fiduciary capacity. 735 ILCS 5/8--201(c) (West 2008).

In ruling on Louis's motion in limine to bar this testimony, the trial court held that the Dead-Man's Act prevented Nancy from offering the testimony on her own behalf and also in her role as administrator of Danielle's estate (because Nancy would inherit whatever was recovered for Danielle, through the laws of intestacy). The trial court found, however, that Nancy had no interest in

Marissa's potential recovery (which would go into a trust to be distributed to Marissa at her majority) and that she therefore could offer the testimony in her role as next friend of Marissa. The court stated that it would consider the testimony only "for that limited purpose."

Had Nancy been suing only in her capacity as Marissa's next friend, the trial court's ruling would have been correct, because Nancy had no direct interest in Marissa's recovery. However, Marissa's interest was parallel to Nancy's, because the claims being asserted were common to both of them. Thus, Nancy's personal interest in the outcome could not be "segregated" from Marissa's interest, and Nancy's testimony violated the proscriptions of the Dead-Man's Act.

Nevertheless, we find that the trial court's error was harmless. The trial court itself appears to have reconsidered its position regarding this testimony, as it did not mention the testimony in its July 18, 2008, findings of fact or its ruling. When Louis argued in his posttrial motion that the court had misapplied the Dead-Man's Act, the trial court stated that the testimony "was a nonfactor in [its] decision" and that it "did not consider that testimony at all in reaching [its] decision." Louis argues that the error could not have been harmless, because the testimony was the only direct evidence of a buy-sell agreement between the brothers. A party need not prove her case using direct evidence, however. Kosch v. Monroe, 104 Ill. App. 3d 1085, 1091 (1982) ("Generally speaking, any fact or issue can be proved by circumstantial evidence as well as direct evidence"); Illinois Pattern Jury Instructions, Civil, No. 3.04 (Supp. 2009) ("Circumstantial evidence is entitled to the same consideration as any other type of evidence"). As we have held, there was ample circumstantial evidence of the brothers' agreement to support the trial court's findings as to the existence and terms of that agreement. We therefore find that any error in the trial court's application of the Dead-Man's Act was harmless and decline to reverse on this ground.

Nancy's Failure to Object to the Closing of George's Estate

Louis next argues that Nancy waived her right to seek recovery of the insurance proceeds because she did not object to the final inventory or closing of George's estate. However, his argument is premised on the assertion that the will was Nancy's sole source of legal rights against him, because he did not breach any fiduciary duty or oral contract with respect to her. As we have already rejected these underlying contentions, we likewise reject this argument. Moreover, waiver is an affirmative act that is an intentional relinquishment of a known right. Siwek v. White, 388 Ill. App. 3d 152, 157-58 (2009). Louis claims that the insurance proceeds passed to him under the will, but there is no evidence that Nancy knew that those proceeds had already been paid out at the time that the estate closed, as Louis did not tell Nancy this and he did not list the insurance proceeds in the final inventory. Thus, there is no evidence that Nancy intentionally relinquished her right to those proceeds when she failed to object to the closing of the estate.

Louis's Entitlement to a Setoff for 445 North Elizabeth

In his answers to the various complaints, Louis asserted the affirmative defense of setoff, alleging that he should receive a setoff for the portion of 445 North Elizabeth that was conveyed to Nancy in March 2002, to be applied against any judgment rendered in Nancy's favor. The trial court ruled that he was not entitled to such a setoff because the property had been transferred to Nancy years earlier and thus he no longer possessed a legal right that he could set off against a judgment. As the trial court stated, "However admirable Lou's actions were at the time [in transferring the property to Nancy], he cannot now claim it as a set-off against Nancy's claim." Louis cites no authority, and we know of none, permitting a party to set off against a present claim a benefit conveyed years earlier. Accordingly, we find no flaw in the trial court's reasoning.

-22-

Louis also protests the trial court's determination that the transfer of the property from Sunrise Homes to Nancy was a gift for which Nancy paid no consideration. Instead, he argues, the property was transferred in exchange for Nancy's surrender of the insurance proceeds and all of her inherited interests in the businesses. However, the trial court specifically found that this explanation was not credible, and, as we previously held, this finding is not against the manifest weight of the evidence. Matchen, 372 Ill. App. 3d at 946. We also note that, although Louis claims that the agreement regarding the property was between Nancy and himself, it was Sunrise Homes, not Louis, that transferred the property to Nancy, and there is no evidence that Louis personally contributed anything toward this transfer, although Louis was the recipient of both the business interests and the insurance proceeds. Because the evidence does not show that the transfer was in return for any benefit to Sunrise Homes, we agree with the trial court's determination that the transfer lacked consideration and must be seen as a gift.

The Unjust Enrichment Claim

Louis makes two contentions with respect to the trial court's judgment in Nancy's favor on her unjust enrichment claim. First, he contends that the evidence did not show that he was unjustly enriched or that Nancy was impoverished by his actions, because he simply distributed George's estate and assets according to the will. We have rejected this contention above and need not discuss it further here. Louis's second argument has more merit, however. He argues that no unjust enrichment can be found where the plaintiff has an adequate remedy at law, such as an action for breach of contract. We review this purely legal argument de novo. People v. Brown, 225 Ill. 2d 188, 198 (2007).

Louis's argument is correct: "unjust enrichment is based on an implied contract, and it does not apply where there is a specific contract that governs the relationships of the parties." SwedishAmerican Hospital Ass'n of Rockford v. Illinois State Medical Inter-insurance Exchange, 395 Ill. App. 3d 80, 108 (2009). Here, we have affirmed the trial court's findings that an oral agreement existed between Nancy and Louis, and its judgment in Nancy's favor on her breach of contract claim against Louis. We therefore vacate the trial court's judgment in Nancy's favor on her unjust enrichment claim.

Amendment of the Complaints and the Award of Prejudgment Interest

Following the issuance of the trial court's memorandum opinion on July 18, 2008, in which it held that Nancy had proved three of her claims (for breach of fiduciary duty, breach of oral contract, and unjust enrichment) and entered judgment in her favor on those claims, Nancy filed posttrial motions in which she directly sought prejudgment interest, and also sought leave to amend her complaints to seek such interest. Nancy cited two bases for her request: the Interest Act (815 ILCS 205/2 (West 2008)), which permits the imposition of statutory prejudgment interest under certain enumerated circumstances; and the trial court's power to enter an equitable award of prejudgment interest. On February 17, 2009, the trial court held that an award of prejudgment interest was warranted because the insurance proceeds rightfully belonging to Nancy had been in Louis's hands for several years, and Nancy should be compensated for his use of that money. The trial court then stated that it would permit Nancy to amend her complaints to include a request for such interest. Finally, it stated that it was awarding prejudgment interest at the prime rate from the date that the estate closed, and it directed the attorneys for the parties to perform the necessary calculations of that amount and prepare an appropriate order. The trial court entered that order on

March 24, 2009. In his final argument on appeal, Louis contends that the trial court erred in permitting Nancy, after the judgment, to amend her complaints to add a request for prejudgment interest. However, Louis does not directly challenge the trial court's ruling that prejudgment interest should be awarded, or the amount of that interest.

As our supreme court has explained, prejudgment interest may be awarded in two instances. In actions at law, prejudgment interest is recoverable only under the Interest Act or if the parties' agreement provides for it. Tri-G, Inc. v. Burke, Bosselman & Weaver, 222 Ill. 2d 218, 257 (2006). However, for causes of action sounding in equity, " 'the allowance of interest lies within the sound discretion of the judge and is allowed where warranted by equitable considerations.' " Tri-G, 222 Ill. 2d at 257, quoting City of Springfield v. Allphin, 82 Ill. 2d 571, 579 (1980). As in other equitable cases, "[t]he rationale underlying an equitable award of prejudgment interest in a case involving a breach of fiduciary duty is to make the injured party complete by forcing the fiduciary to account for profits and interest he gained by the use of the injured party's money." In re Estate of Wernick, 127 Ill. 2d 61, 87 (1989). The trial court's determination that equitable considerations support an award of prejudgment interest will not be disturbed unless it is an abuse of discretion. Wernick, 127 Ill. 2d at 87.

In this case, both bases for awarding interest are present because Nancy prevailed on one claim that sounded in equity (the breach of fiduciary duty claim), and one claim based in law (the claim that Louis breached his oral agreement with her). There is some support for the view that the trial court based its award of prejudgment interest on equitable considerations, because in announcing its decision, the court stated that it was granting interest at the prime rate, a rate that is available only for equitable awards of interest. See Wernick, 127 Ill. 2d at 88 (equity dictates an award of interest

at the prime rate so that the injured party may be made whole); cf. 815 ILCS 205/2 (West 2008) (permitting interest at the rate of 5% per year). We note, however, that Nancy states that interest at the statutory 5% rate was ultimately awarded (perhaps because in February 2009 the prime rate was below 5%), and thus it is possible to read the March 24, 2009, order from which Louis appealed as awarding interest pursuant to the Interest Act. The order itself does not identify which authority the award was based upon.

If the interest was imposed pursuant to the Interest Act, it could have been sought at any time while the case was pending before the trial court. Prejudgment interest need not be requested in the complaint in order to be recoverable under the Interest Act; when the evidence at trial establishes that a party is entitled to prejudgment interest under the Interest Act, a request for such interest will be read into the complaint. Kehoe v. Wildman, Harrold, Allen & Dixon, 387 Ill. App. 3d 454, 473 (2008); Boyd v. United Farm Mutual Reinsurance Co., 231 Ill. App. 3d 992, 1000 (1992); Madison Park Bank v. Field, 64 Ill. App. 3d 838, 843 (1978). Louis cites two cases in which courts held that prejudgment interest was not recoverable because it was not requested in the complaint (Gaiser v. Village of Skokie, 271 Ill. App. 3d 85, 96 (1995), and Englemann v. Standard Mutual Insurance Co., 4 Ill. App. 3d 55, 57 (1972)), but both of these cases were decided before Kehoe, and neither contains any discussion of the issue. Thus, the fact that the complaints on file at the time of trial did not contain an explicit request for prejudgment interest is of no moment, and accordingly, the trial court's decision to permit Nancy to file amended complaints seeking such interest is at most harmless error.

Moreover, Nancy points out that section 2--616(c) of the Code of Civil Procedure (735 ILCS 5/2--616(c) (West 2008)) permits pleadings to be "amended at any time, before or after judgment,

to conform the pleadings to the proofs," upon just terms. In considering whether to permit such an amendment, the trial court should consider whether the amendment will further the ends of justice, whether the amendment alters the nature of the proof required to defend against the claim, and whether the opposing party will be surprised or prejudiced. American National Bank & Trust Co. of Chicago v. Dozoryst, 256 Ill. App. 3d 674, 678-79 (1993). In addition, such an amendment may be allowed only where it is supported by the evidence. Village of Wadsworth v. Kerton, 311 Ill. App. 3d 829, 842 (2000). The decision to permit amendment of the pleadings is within the trial court's discretion, and will be reversed only for an abuse of that discretion. Claxton v. Grose, 226 Ill. App. 3d 829, 831 (1992).

Here, the evidence at trial supported the award of prejudgment interest, and allowing the amendment to add a request for such interest furthered the ends of justice because it prevented Louis from profiting from his wrongful retention of the insurance proceeds due to Nancy. Wernick, 127 Ill. 2d at 88. Moreover, allowing the amendment did not alter the nature of the proof needed at trial: prejudgment interest is recoverable upon a showing that the opposing party has breached a fiduciary duty and that such interest is necessary to make the beneficiary whole (Wernick, 127 Ill. 2d at 86-87), and this is essentially the same evidence that Nancy was already required to present in order to prove her claim for breach of fiduciary duty and that Louis was already required to defend against. Accordingly, permitting the amendment of the complaints prior to trial would have added nothing to Louis's burden of defending himself, and thus, the amendment after trial did not prejudice Louis. Dozoryst, 256 Ill. App. 3d at 678-79; see also In re Joy Recovery Technology Corp., 291 B.R. 111, 118 (Bankr. N.D. Ill. 2003) (where the claims against the defendants included breach of fiduciary duty, and the defendants' good faith or lack thereof was the primary issue in the case, the contention

that they "would have somehow defended the case differently had they known that Plaintiff intended to request prejudgment interest" had no merit). For all of these reasons, the trial court's decision to allow Nancy to amend the pleadings to request prejudgment interest was not an abuse of discretion.

In summary, we affirm the judgment of the circuit court of Du Page County with respect to its judgment in favor of the plaintiffs on their claims for breach of fiduciary duty and breach of oral contract, and we vacate that portion of the judgment finding in Nancy's favor on her unjust enrichment claim.

Affirmed in part and vacated in part.

O'MALLEY and JORGENSEN, JJ., concur.