2023 IL App (2d) 220192-U
No. 2-22-0192
Order filed August 1, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| KILDEER OUTLOTS, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff/Counterdefendant-Appellee/ | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-L-998 |
| | ) | |
| MICHAEL T. ORIGER, | ) | |
| | ) | Honorable |
| Defendant/Counterplaintiff-Appellant/ | ) | Charles W. Smith, |
| Cross-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court did not err in finding defendant liable for breach of contract and breach of fiduciary duty, finding set-off not applicable, and awarding punitive damages of $15,000.

¶ 2    After a bench trial, the circuit court of Lake County found that the defendant/counterplaintiff, Michael Origer, had breached a trust agreement between himself and the plaintiff/counterdefendant, Kildeer Outlots, LLC, and had also breached the fiduciary duty that he owed to Kildeer.  The trial court awarded $500,000 in compensatory damages as well as $15,000 in punitive damages for the breach of fiduciary duty.  Origer appeals, raising various

arguments about the correctness of the trial court's findings of liability and the damages award, and Kildeer cross-appeals, arguing that the amount of punitive damages was too low. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The property at issue in this case is a portion of the Cypress Grove subdivision at the northeast corner of Quentin Road and Route 22 in unincorporated Lake County. The subdivision was originally approved and platted for 110 single-family homes and two outlots or common areas. Part but not all of the outlots were needed for stormwater management for the subdivision.

¶ 5     A declaration of subdivision (Declaration) governed the management of the subdivision under a homeowners' association (HOA or Association). Section 2.13 of the Declaration provided that "The Common Area shall be conveyed to the Association by the Declarant *** on or before the Turnover Date," a date eventually determined to be January 11, 2014. Section 10.02 provided that the Declaration could be amended by the affirmative vote of voting members representing at least 75% of the total votes.

¶ 6     Patrick and Bryan Taylor, longtime home builders, owned the subdivision prior to 2010. The Village of Hawthorn Woods expressed interest in seeing the southern portion of the property near the intersection developed with commercial rather than residential uses. That portion included 20 residential lots (20 Lots) and portions of the two outlots (Outlot A and Outlot B, collectively Outlots). No commercial uses could be established there without the Outlots.

¶ 7     After the housing recession in 2008, the slow market for homes and looming foreclosure caused the Taylors to look for buyers for the property. Peter Brennan, the manager of Hawthorn 45, LLC, bought the northern residential lots. At some point before 2015, Brennan became the successor Declarant for the Association. The Taylors retained ownership of the Outlots, which were eventually transferred to Kildeer, an entity controlled by the Taylor family. Between 2010

and 2014, the Taylors and Brennan successfully sought annexation of the subdivision into the Village. One of the purposes of the annexation was to develop the property at the intersection for commercial purposes.

¶ 8    In 2012, Origer, through his entity 2847 Cypress Grove, LLC, bought the southern portion of the subdivision, including the 20 Lots that were, along with the Outlots, necessary for commercial development at the intersection. In January 2013, Origer and Brennan secured the votes needed to amend section 2.13 of the Declaration. Although it still provided that, "[e]xcept as otherwise provided in this Section 2.13," the common areas were to be conveyed to the HOA "on or before the Turnover Date," it added lengthy provisions setting different conveyance procedures and time limits "in the event the Owner of the Southern Lots elects to develop the Southern Lots for commercial use." As amended, section 2.13 read as follows:

"OWNERSHIP: *Except as otherwise provided in this Section 2.13*, the Common Area shall be conveyed to the Association by Declarant free and clear of any mortgage or trust deed whatsoever on or before the Turnover Date; provided that, if any Common Area is made subject to this Declaration after the Turnover Date, such Common Area shall be conveyed to the Association free and dear of any mortgage or trust deed whatsoever simultaneously with such Common Area being made subject to this Declaration. *Notwithstanding the foregoing*, in the event the Owner of the Southern Lots elects to develop the Southern Lots for commercial use: (i) and title to Common Area is vested in the Association, the portion of the Common Area depicted on Exhibit E, attached hereto and made a part hereof, or so much thereof as is requested by the Owner of the Southern lots (the "Commercial Outlot") shall be conveyed by the Association to the Owner of the Southern Lots at no cost and free and clear of any mortgage or trust deed whatsoever within ten (10) days prior written

request therefor; provided, however, that the conveyance cannot have a material adverse impact on the stormwater management facilities serving the balance of the Subdivision. The Owner of the Southern Lots shall reconvey the Commercial Outlot back to the Association at no cost to the Association, and free from any liens caused by or at the direction of the Owner of the Southern Lots, prior to the Southern Lots being developed for single family residential use; and (ii) title to the Common Area is not yet vested in the Association, or after transfer out of the Association noted in subsection (i) above, the Association, within ten (10) days prior written request therefor, but in connection and coordination with any revision to the final plat of subdivision affecting the Southern Lots required by a governing entity, shall record an amendment to the Declaration, revising the definition of Common Area to specifically exclude the Commercial Outlot." (Emphasis added.)

Origer's long-time attorneys prepared the amendment documents. At trial, Origer testified that the purpose of the amendment was to permit the removal from the HOA's common area of any portions of the Outlots that were needed for commercial development. Although Kildeer still owned the Outlots, it was not notified of the amendment and did not know of it.

¶ 9    A little over a year after the amendment to the Declaration, in March 2014, Origer received a letter of intent from Bradford Development, expressing interest in purchasing, for $2,125,000, the 20 Lots and the necessary portions of the Outlots for a commercial development. Although Origer did not own or control the Outlots, he signed the letter of intent. Origer then approached Brian Taylor and told him of Bradford's interest in the purchase. In July 2014, Origer and Kildeer entered into a trust agreement (Trust Agreement) under which the Outlots were transferred to the Trust, subject to Origer's sole and exclusive power of direction. The Trust Agreement, which was

drafted by Origer's attorneys, gave Origer the power to sell his 20 Lots and the portion of the Outlots needed for commercial development. The Trust Agreement provided that, if any portion of the Outlots was transferred to a third party for commercial development, Origer would pay Kildeer $500,000. However, if the Outlots were simply transferred to the HOA (as required by the Declaration in the event that no commercial development occurred), Origer would pay Kildeer nothing. The Bradford Development offer fell through a few months later, and Origer pursued other leads for commercial development of the property.

¶ 10    In November 2015, Origer and Brennan (through their entities) agreed that Brennan would buy the 20 Lots for $1.6 million. Although at trial Origer and Brennan denied communicating with each other about Brennan's plans to commercially develop the 20 Lots and portions of the Outlots, email exhibits showed that in fact they did so, and the trial court later specifically found them not credible on this point. On December 22, 2015, Origer, through his power of direction under the Trust Agreement, directed Chicago Title and Trust Company, the trustee holding the title to the Outlots, to execute a deed for the Outlots to the HOA. However, rather than directing Chicago Title to record the deed, Origer told them to send the deed to an address in Palatine. Origer did not tell Kildeer about his sale of the 20 Lots to Brennan or his instruction to transfer the Outlots.

¶ 11    The closing of Origer's sale of the 20 Lots to Brennan took place in early to mid-January 2016. Origer had used a different attorney to arrange the sale of the 20 Lots. She testified that, before the closing, Origer met with Brennan and handed him the deed to the Outlots. At trial, multiple witnesses testified that Origer gave Brennan the deed without any requirements on its use, as part of their $1.6 million deal for the purchase of the 20 Lots. Brennan did not immediately record the deed to the Outlots on behalf of the HOA.

¶ 12    On February 2, 2016, Kildeer learned that the deed to the Outlots had been transferred out of the trust and the trust had been closed. Kildeer's attorney immediately wrote Origer, demanding information and documents relating to the transfer. Shortly thereafter, Origer emailed Brennan and suggested that the deed to the Outlots should be recorded sooner rather than later.

¶ 13    Instead of recording the deed (thereby transferring the Outlots to the HOA), Brennan wrote to the HOA president in mid-February, saying that he, as the new owner of the 20 Lots, had decided to develop them commercially as permitted by the 2013 amendment to the Declaration. Brennan said that he would record the Chicago Title deed transferring the Outlots to the HOA only if the HOA agreed to immediately give Brennan a deed for the portions of the Outlots needed for commercial development of the 20 Lots. Brennan created a plat showing which portions of the Outlots he needed for the commercial development. Brennan kept the deed for the Outlots in his possession until he received the deed from the HOA giving him those portions of the Outlots that he needed. He then simultaneously recorded both deeds on April 14, 2016.

¶ 14    Brennan met with Kildeer on February 19, 2016. Before that meeting, Origer had told Brennan that he did not intend to pay Kildeer the $500,000 that Kildeer believed was owed under the Trust Agreement. During the meeting, Brennan's entity Hawthorn 45 reached an agreement with Kildeer that, in return for $400,000, Kildeer would cooperate and not interfere with Brennan's plans for commercial development. That same day, Hawthorn 45 filed with the Village an 86-page application for commercial rezoning of the corner property. At trial, both Origer and Brennan testified that the agreement between Hawthorn 45 and Kildeer did not include the assumption of any portion of Origer's obligation to Kildeer under the Trust Agreement.

¶ 15    In May 2017, the Village approved the rezoning of Brennan's property for a mixed-use residential and retail development.  Brennan was then able to sell the property to a third party for $3.6 million.

¶ 16    In December 2017, Kildeer brought two lawsuits, one against Origer and one against Hawthorn 45.  The suit against Origer claimed breach of contract (the Trust Agreement) and breach of fiduciary duty.  The suit against Hawthorn 45 alleged that it breached the forbearance agreement by failing to pay Kildeer $400,000.  Brennan ultimately settled the suit against Hawthorn 45, paying Kildeer $225,000.

¶ 17    In December 2021, Kildeer's suit against Origer was tried in a bench trial.  Following the close of the trial, the trial court entered judgment for Kildeer, awarding it $500,000.  Although the trial court's memorandum decision was titled "Order and Ruling on Count II" (the breach of contract claim), the court's ruling also included findings that Origer had breached his fiduciary duty toward Kildeer: "Defendant breached his duty of loyalty to plaintiff and in fact abandoned his duty by giving the deed that he was to record to a third party, to wit, Hawthorne [*sic*] 45."

¶ 18    The trial court's order continued the proceedings for a hearing on Kildeer's request that Origer be assessed punitive damages and attorney fees.  On May 3, 2022, the trial court entered an order awarding Kildeer $15,000 in punitive damages on its breach of fiduciary duty claim.

¶ 19    Origer filed a timely appeal challenging several aspects of the trial court's judgment.  Kildeer cross-appealed, arguing that the punitive damages award should have been higher.

¶ 20                                 II. ANALYSIS

¶ 21                                 A. The Appeal

¶ 22    On appeal, Origer claims that the trial court erred in finding that he breached the Trust Agreement, finding that he breached his fiduciary duty toward Kildeer, granting summary

judgment in favor of Kildeer on his counterclaim for set-off, and awarding punitive damages. We examine each argument in turn.

¶ 23                                     1. Breach of Contract

¶ 24     Origer attacks the trial court's finding that he breached the Trust Agreement on the ground that Kildeer cannot enforce the Trust Agreement because, at the time the agreement was formed, Kildeer could not convey complete ownership of the Outlots to the trust, and thus the Trust Agreement lacked consideration. He also argues that, by the same token, Kildeer cannot enforce the contract because it breached first (by failing to convey complete title to the Outlots). In the alternative, he argues that the parties were mutually mistaken about Kildeer's ability to convey complete title to the Outlots and thus the contract should be set aside. Finally, he argues that he cannot be found to have breached the contract because he complied with its terms.

¶ 25     The thrust of Origer's arguments about Kildeer's ability to convey complete title to the Outlots to the trust is that, because the Declaration provided that common area including the Outlots was to be transferred to the HOA on the Turnover Date (established through a different provision as January 11, 2014), "equitable title" to the Outlots passed to the HOA on that date. After that, he argues, Kildeer could only give the trust partial title (legal but not equitable title) to the Outlots. As the Trust Agreement required Kildeer to deliver both legal and equitable title, he argues that Kildeer could not and did not meet its obligations under the agreement. Kildeer responds that the obligation to transfer the Outlots to the HOA by January 2014 was modified well before that date, in January 2013, when several property owners including Origer himself amended section 2.13 of the Declaration. Kildeer also argues that, even leaving the January 2013 amendment aside, there is no support in Illinois law for the concept of "equitable title" passing to an HOA under such circumstances.

¶ 26      The construction of a document such as the Declaration is an issue of law, which we review *de novo*. *Gallagher v. Lenart,* 226 Ill. 2d 208, 219 (2007).  "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher*, 226 Ill. 2d at 232.  The language of a contract, given its plain and ordinary meaning, is the best indication of the parties' intent.  *Id.* at 233.  "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others."  *Id.*  When construing contracts, courts attempt to give effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose.  See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.,* 223 Ill. 2d 352, 362 (2006).

¶ 27      Applying these principles, we agree that the January 2013 amendment modified the Declaration such that no aspect of the title to the Outlots was required to pass to the HOA in January 2014.  The Declaration included procedures to be used in amending the Declaration, the signatories to the amendment followed those procedures, and the amendment became effective when adopted in January 2013.  The plain language of the amended section 2.13 of the Declaration shows clearly the intent that ownership of the Outlots would not necessarily pass to the HOA on January 11, 2014.  The amendment modified that requirement by inserting the qualifier "[e]xcept as otherwise provided"—and, as amended, section 2.13 provided different procedures and time limits for transferring the ownership of the Outlots if the owner of the southern lots (the 20 Lots) chose to develop those lots for commercial use.

¶ 28      Thus, the date on which the Outlots were required to be transferred to the HOA depended on factors other than the arrival of January 11, 2014, and that date was no longer a hard and fast deadline for the transfer.  Further, section 2.13 set no deadline by which the owner of the southern lots was required to decide whether to commercially develop those lots.  Accordingly, the date on

which the Outlots were required to be transferred to the HOA could only be determined retrospectively, by asking whether, at the time in question, the owner of the southern lots had elected to develop them commercially: if not, then the transfer should have occurred on January 11, 2014; but if so, then the January 2014 date did not control and the alternate procedures and deadlines applied.

¶ 29     At the time Kildeer and Origer entered into the Trust Agreement, they both intended to develop the southern lots commercially. Thus, the alternate deadlines and procedures for the transfer of the Outlots to the HOA were applicable. Similarly, when Brennan, as the new owner of the 20 Lots, decided to develop those lots commercially, the alternate time limits and procedures for transferring the Outlots to the HOA were applicable.

¶ 30     As the Outlots were not required to be transferred to the HOA in January 2014, the interest conveyed by Kildeer to the trust under the Trust Agreement was complete title to the Outlots. Our conclusion in this regard disposes of Origer's arguments that the Trust Agreement lacked consideration, that Kildeer breached the agreement first by not conveying complete title, and that the Trust Agreement should be set aside on the ground of mutual mistake.

¶ 31     We turn to Origer's argument that he in fact complied with the Trust Agreement. The Trust Agreement provided in relevant part that Kildeer "recognizes it shall not receive any compensation for any portion or all of the Real Estate transferred to the HOA," but "[u]pon any sale to a third party, whenever it occurs, [Kildeer] shall be entitled to the sum of $500,000, and no more, as proceeds from that sale." Origer argues that he transferred the Outlots to the HOA and thus, under the terms of the agreement, he did not owe Kildeer $500,000.

¶ 32     Origer raised this same argument before the trial court. In response, Kildeer argued that (a) Origer's transfer of the deed to the Outlots to Brennan was part of the same deal in which

Origer sold Brennan the 20 Lots; and (b) although Origer instructed Chicago Title to issue the deed to the Outlots in the name of the HOA, he also instructed that the deed be sent to someone other than the HOA, and he himself later gave the deed to Brennan. Kildeer argued that this course of events constituted a sale to a third party rather than a transfer to the HOA. Kildeer pointed out that a conveyance of real estate is not complete or effective without delivery of the deed. *Estate of Mendelson v. Mendelson*, 2016 IL App (2d) 150084, ¶ 20. Further, although delivery of a deed to a third party with instructions to complete the transfer of title to the grantee is effective immediately (*Michalski v. Chicago Title & Trust Co.*, 50 Ill. App. 3d 335, 340 (1977)), when the grantor delivers a deed to a third party without any such instructions, delivery to the grantee has not occurred (*Alexander v. American Bible Society*, 407 Ill. 49, 57 (1950)).

¶ 33    The trial court found that Origer gave the deed to the Outlots to Brennan to be used for his own purposes, and thus did not effectively transfer the Outlots to the HOA. In a bench trial, the trial court sits as the trier of fact, hearing the witnesses and reviewing the direct presentation of the evidence, and it therefore is in the best position to make credibility determinations and factual findings. *In re Marriage of Matchen*, 372 Ill. App. 3d 937, 946 (2007). We therefore will not reverse the trial court's factual findings unless they are against the manifest weight of the evidence; that is, unless "the opposite conclusion is clearly evident or the [factual] finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007). That standard is not met here. We affirm the trial court's conclusion that, as the deed to the Outlots was given to a third party (Brennan and Hawthorn 45) as part of Origer's sale of the 20 Lots to them, Origer owed Kildeer $500,000 under the Trust Agreement, and Origer's failure to pay Kildeer was a breach of contract.

¶ 34                      2. Breach of Fiduciary Duty

¶ 35    The Trust Agreement clearly reflects the reason that Kildeer gave the Outlots to the trust and gave Origer power of direction over the Outlots: to facilitate the sale of both parties' property (the 20 Lots and the Outlots) for commercial development. The Trust Agreement also expressly contemplates that Kildeer would receive $500,000 if this came to pass. The evidence showed that the Bradford deal initially contemplated by the parties would have resulted in Origer receiving $1.6 million for his 20 Lots and Kildeer receiving $500,000 for its Outlots.

¶ 36    After that deal fell through, the trial court found, Origer reached a new deal with Brennan in which Origer would still receive $1.6 million for his 20 Lots, but Kildeer would not receive its $500,000 (and thus the cost to Brennan would be lower) because Origer would appear to have transferred the Outlots to the HOA, while delivering the deed to Brennan to use as leverage for a land swap. Origer did not tell Kildeer either about the amendment to the Declaration that enabled Brennan's eventual land swap, nor about his sale of the 20 Lots to Brennan and his delivery of the deed to the Outlots to Brennan. Instead, when Kildeer found out that the deed to the Outlots had been transferred out of the trust, Origer urged Brennan to record the deed quickly.

¶ 37    The trial court found that

"[t]his sequence of events is no mere happenstance, the timing suggests that the defendant and Brennan acted in concert to obtain control of [the Outlots], make a deal with the HOA to replat the subdivision and give the Village what it wants, commercial development of the corner[--]in the process making a profit for Brennan and depriving plaintiff of his rights under the trust agreement to the bargained for $500,000."

At trial, Origer and Brennan testified that they did not discuss Brennan's plans to develop the southern lots commercially, but the trial court expressly found their testimony not to be credible.

All of these findings were the basis for the trial court's conclusion that Origer breached his fiduciary duty of loyalty to Kildeer.

¶ 38    Origer does not dispute that, as holder of the power of direction under the Trust Agreement, he was in a position of trust and owed Kildeer a fiduciary duty.  See 765 ILCS 435/5(b) (West 2020).  Instead, he argues that the trial court "overlooked" evidence and asserts once again that he transferred the Outlots to the HOA and thus only did as the Trust Agreement permitted in failing to pay Kildeer.  This argument asks us to reject the trial court's findings, but we cannot do so unless they are against the manifest weight of the evidence.  *Samour*, 224 Ill. 2d at 544.  Here, there is ample evidence in the record to support the trial court's findings that Origer and Brennan conspired to deprive Kildeer of $500,000 it would have been owed if the Outlots had been sold to Brennan in a more aboveboard manner.

¶ 39    A fiduciary "must act honestly and with undivided loyalty" (*Laubner v. JP Morgan Chase Bank, NA.*, 386 Ill. App. 3d 457, 464 (2008)), must "fully and completely disclose all material facts" surrounding the trust property (*Obermaier v. Obermaier*, 128 Ill App. 3d 602, 607 (1984)), and must avoid self-dealing at the expense of those benefited by the trust (*Bracken v. Block*, 204 Ill. App. 3d 23, 25 (1990)).  The evidence discloses that Origer violated these obligations.  The trial court's determination that he had violated his fiduciary duty toward Kildeer was not against the manifest weight of the evidence.

¶ 40    Origer also argues that, even if he breached his fiduciary duty toward Kildeer, his breach did not injure Kildeer.  This argument is mystifyingly obtuse: the evidence clearly establishes that Origer's failure to inform Kildeer of his deal with Brennan and include Kildeer in that deal cost Kildeer $500,000.  The trial court did not err in finding that a unitary recovery of $500,000 was justified for Origer's breach of the Trust Agreement and his breach of fiduciary duty.

¶ 41    Origer's final argument regarding the breach of fiduciary duty claim is that it should have been dismissed as duplicative of the breach of contract claim. But Origer has not shown that he ever raised this argument before the trial court, and thus it is forfeited. "A reviewing court will not consider arguments not presented to the trial court." *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010). Moreover, even if the argument were not forfeited, it lacks merit. *McQueen v. Green*, 2022 IL 126666, ¶ 43 ("Settled law allows plaintiffs to plead and prove multiple causes of action," including alternate grounds for recovery). We affirm the trial court's finding that Origer breached his fiduciary duty to Kildeer.

¶ 42                                3. Origer's Counterclaim

¶ 43    Origer next contends that the trial court erred in granting summary judgment against him on his counterclaim. In that counterclaim, Origer alleged that Kildeer's recovery of $225,000 from Hawthorn 45 (in settlement of Kildeer's claim that Hawthorn 45 breached the forbearance agreement) should be applied to reduce any damages Origer might owe Kildeer arising from his breach of the Trust Agreement or of his fiduciary duty toward Kildeer under the trust. Arguing that the two agreements were distinct and thus its claims rested on different injuries, Kildeer moved for summary judgment as a matter of law. The trial court found that the two agreements were "separate and distinct contracts" and thus set-off should not be permitted. It entered summary judgment in favor of Kildeer.

¶ 44    A motion for summary judgment is properly granted where the pleadings, depositions, admissions, and affidavits establish that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2020). We review the grant of summary judgment *de novo*. *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 19.

¶ 45    Origer asserts that "a payment by one tortfeasor diminishes a plaintiff's claim against all other tortfeasors responsible for the same harm in order to ensure that the plaintiff receives only one satisfaction for any one injury" (*Hentze v. Unverfehrt*, 237 Ill. App. 3d 606, 612-13 (1992)), and that "[a] similar rule applies in contract cases" (*id.* at 613). Origer argues that both of Kildeer's lawsuits, the one against him and the one against Hawthorn 45, were premised on the same injury—"payment for the Outlots." Because Kildeer should not be permitted to recover twice for that injury, he contends, the $500,000 judgment against him should be reduced by the amount that Hawthorn 45 paid Kildeer to settle the claim against it.

¶ 46    Origer's argument fails because its factual premise is flawed: the two lawsuits did not involve the same injury. Kildeer's claims against Origer indeed involved his failure to pay Kildeer for the Outlots as provided by the Trust Agreement. But Kildeer's claim against Hawthorn 45 involved a different contract entirely, Kildeer's agreement to forbear challenging Hawthorn 45's ownership of portions of the Outlots until after Brennan obtained the zoning approvals he sought from the Village, in exchange for $400,000. Brennan testified that his agreement to pay this sum was in no way an agreement to assume responsibility for Origer's failure to pay Kildeer the $500,000 owed under the Trust Agreement. Instead, the evidence shows, Brennan calculated that an unhindered ability to secure zoning approvals for the property was worth at least $400,000. The evidence further shows that Brennan was not wrong in this: with those approvals in hand, he was later able to sell the property for $3.6 million, $2 million more than he paid for it. After Hawthorn 45 failed to pay Kildeer for its forbearance, Kildeer brought suit. That suit was based on an entirely different injury than Origer's failure to pay Kildeer as required by the Trust Agreement. Thus, there was no legal basis for any reduction in the damages awarded to Kildeer in its suit against Origer. Origer's final assertion—that the trial court's later comments regarding the amount of

punitive damages that were appropriate somehow constituted an admission that it had erred in granting summary judgment on Origer's counterclaim—is refuted by the record. We find no error in the trial court's grant of summary judgment in Kildeer's favor.

¶ 47                                   4. Punitive Damages Award

¶ 48    Origer's final argument is that the trial court should not have awarded any punitive damages in connection with his breach of fiduciary duty toward Kildeer because he simply followed the advice of his counsel, who advised him that he should transfer the Outlots to the HOA. However, as the trial court found, Origer did *not* actually transfer the Outlots to the HOA, because a conveyance of land is not effective without delivery of the deed. Rather, as part of the deal in which Origer sold his 20 Lots to Brennan, he conspired with Brennan and gave the deed for the Outlots to Brennan so that Brennan had leverage to negotiate the land swap with the HOA, thereby enabling Brennan to obtain the portion of the Outlots that he needed for commercial development without payment to Kildeer. Because the record establishes that Origer did not in fact follow the advice of his counsel and simply transfer the Outlots to the HOA, we reject his argument.

¶ 49                                   B. The Cross-Appeal

¶ 50    The sole issue raised by Kildeer's cross-appeal is whether the trial court erred in determining that $15,000 was an appropriate award of punitive damages. The parties dispute whether we should review the trial court's award for abuse of discretion or using the manifest-weight-of-the-evidence standard. We note that to a great extent these standards overlap. Compare *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11 (a trial court abuses its discretion if its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law) with *Samour*, 224 Ill. 2d at 544 (a finding is

against the manifest weight of the evidence if "the opposite conclusion is clearly evident or the [factual] finding is arbitrary, unreasonable, or not based in evidence"). We do not decide which standard applies here as, under either standard, the result would be the same.

¶ 51    Kildeer complains that the purpose of a punitive damages award is to deter and punish the wrongdoer, and that this purpose was not adequately achieved here, especially given that it took Kildeer five years' of attorney fees to prevail. But it is well settled that "[t]he assessment of punitive damages is a highly factual decision, which is appropriately made at the trial court level." *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 69 (2009). Here, the record reflects that the trial court considered the egregiousness of Origer's course of conduct as well as all other aspects of the litigation in setting the amount of the award. And although a court may consider such factors as the wrongdoer's wealth and the amount of attorney fees expended by the victor, Kildeer did not offer any evidence on either of these points, and thus it cannot complain that the trial court erred in failing to give great weight to these factors.

¶ 52    When reviewing a trial court's determination under the abuse of discretion standard, "we may not substitute our judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely." *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002). Similarly, "[u]nder the manifest weight standard, a trial court's decision in a bench trial is subject to considerable deference" and "[a] reviewing court must not substitute its judgment for that of the trier of fact." *In re Z.L.*, 2021 IL 126931, ¶ 82 (citing *Samour*, 224 Ill. 2d at 548). Under either of these standards, we cannot reweigh the evidence or second-guess the trial court's determination. We affirm the trial court's decision to award Kildeer $15,000 in punitive damages.

¶ 53                                   III. CONCLUSION

¶ 54    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 55       Affirmed.